### JEROME B. COCHRAN ET AL. V. FREDERICK MOERER.

Decided November 5, 1907.

**1.—Issue of Fact—Appeal—Practice.**

The Appellate Courts will not reverse a case on an issue of fact passed upon by a jury if there is any evidence in the record, which, viewed in the light most favorable to the appellee, is sufficient to support the verdict.

**2.—Possession—Limitation—Fact Case.**

In a suit of trespass to try title, involving boundary, evidence as to the nature and extent of defendant's possession considered, and held sufficient to support a finding in favor of defendant's plea of ten years' limitation.

**3.—Possession—Interruption—Limitation.**

C. and M. each claimed title to a strip of land which was in the actual possession of M. C. built a fence so as to include the land in his own enclosure; a short time thereafter M. removed the fence; the possession of M. was in no other way disturbed than by the building of the fence. Held, the building of the fence did not so break the continuity of M.'s possession as to interrupt the running of the statute of limitation in his favor.

**4.—Error in Judgment—Correction—Practice.**

Where a disclaimer was ambiguous in its description of the land to which it referred, and the trial court misinterpreted the description, the matter should have been brought to the attention of the trial court, else no complaint can be considered on appeal.

Error from the Sixty-First District Court, Harris County. Tried below before Hon. Norman G. Kittrell.

*Tharp & Whitehead* and *Ewing & Ring,* for plaintiffs in error.—That the evidence is legally insufficient, independent of being short in time, to meet the requirement of such possession, with cultivation, use or enjoyment, as is exclusive, hostile, or adverse to, or entirely inconsistent with, the claim of the true owner, see Murphy v. Welder, 58 Texas, 241; Fuentes v. McDonald, 85 Texas, 135, 136; Broom v. Pearson, 98 Texas, 474, and Cook v. Lister, 15 Texas Civ. App., 31.

That limitation was suspended during the period commencing January 28, 1861, and ending March 30, 1870, see Sayles Texas Civ. Stats., art. 3366.

That the requisite continuity was broken between the calf pasture period and the Halff and Neubar period, so that the possession under one period could not be tacked to the other, as the trial court distinctly told the jury in its charge, see Sayles' Texas Civ. Stats., art. 3348, defining peaceable possession to be "such as is continuous," etc.

That the entry upon and fencing of the land by Cochran and Settegast interrupted limitation under the period after the Halff and Neubar fence went up, as the trial court pointedly informed the jury, see Brickett v. Spofford, 14 Gray (Mass.), 514; Brolaskey v. McClain, 61 Pa. St., 146; Henderson v. Griffin, 5 Pet. (U. S.), 158; 1 Am. & Eng. Ency. of Law, 2d ed., pp. 836-837.

That to make out ten years' limitation, cultivation, use or enjoyment had to concur with the fencing, continuously, see Peden v. Crenshaw, 98 Texas, 365, 370; Niday v. Cochran (Texas Civ. App.), 93 S. W. Rep., 1027.

That where the trial court, on account of the legal insufficiency of the evidence, might have given a peremptory instruction, it is proper for this court to reverse and render, see Henne v. Moultrie, 97 Texas, 216.

That proof of the element of time, under a plea of limitation, must be clear, and not indefinite or uncertain, see Broom v. Pearson, 98 Texas, 473-474; 1 Am. & Eng. Ency. of Law, 2d ed., p. 887, and cases cited.

That where, under the rule of law as to certainty in the proof, all reasonable minds must conclude that the period of adverse possession and use is not made out, the issue will be controlled as matter of law, see Lee v. International & G. N. Ry. Co., 89 Texas, 588.

That the entry and fencing by the plaintiffs, Cochran and Settegast, in open daylight under claim of ownership, brought to the notice of defendant as shown by the conversation with his son, C. Moerer, interrupted the adverse possession, if such there was, so as to stop limitation, see Brickett v. Spofford, 14 Gray (Mass.), 514; Brolaskey v. McClain, 61 Pa. St., 146; Henderson v. Griffin, 5 Pet. (U. S.), 158; 1 Am. & Eng. Ency. of Law, 2d ed., pp. 836-837.

That the statement of a witness, which a physical condition condemns, is not more than a *scintilla,* see Texas & Pac. Ry. Co. v. Ball, 96 Texas, 625.

That if the evidence were not legally insufficient the verdict would

be condemned because clearly wrong, as against the manifest weight of the evidence, see Harnage v. Berry, 43 Texas, 568-569, a case very similar in some features; Missouri Pac. Ry. v. Somers, 78 Texas, 439.

*A. R. & W. P. Hamblen* and *Fisher, Sears & Campbell,* for defendant in error.—That the facts show adverse and peaceable possession for ten years. 1 Cyclopedia of Law & Proc., pp. 983, 984 and 985, and cases cited; Richards v. Smith, 67 Texas, 610; Texas & P. Ry. v. Maynard, 51 S. W. Rep., 255; Dunn v. Taylor, 94 S. W. Rep., 351; McCarty v. Johnson, 20 Texas Civ. App., 187.

Whether possession is adverse, and such as will afford the party claiming it the protection given by the statute, is a question of fact for the determination of the jury, in view of all the evidence before them. Word v. Drouthett, 44 Texas, 370; Gunter v. Meade, 78 Texas, 638.

When there is evidence to support a verdict, and the court below has refused a new trial, the judgment will not be reversed, although there was much evidence tending to an opposite conclusion from that at which the jury arrived, and the Appellate Court may not be well satisfied with the correctness of the finding. Anderson v. Anderson, 23 Texas, 641; Owens v. Missouri Pac. Ry., 67 Texas, 681; Smith v. Pierce, 62 S. W. Rep., 1074; Gulf, C. & S. F. Ry. v. Johnson, 10 Texas Civ. App., 262; Latham v. Selkirk, 11 Texas, 321.

The land being in defendant's possession, that possession was not broken by Cochran fencing, too. Cobb v. Robertson, 99 Texas, 138.

McMEANS, ASSOCIATE JUSTICE.—This was an action of trespass to try title for 43.7 acres of land out of the west half of the Luke Moore league, in Harris County, brought by Jerome B. Cochran and W. J. Settegast, Jr., plaintiffs below, against Frederick Moerer, defendant below. The answer set up a plea of not guilty, the several pleas of limitation, and a plea that defendant owned the land in controversy, describing it by metes and bounds, and adding, following the description: "Being the same land plaintiffs sue for except a strip 9 feet wide along said dividing line throughout its entire length, and being the same land to which the plea of limitation herein applies, and the same land which plaintiffs describe as a part of lot No. 13." The issues of the case were of boundary and ten years' limitation, the question of boundary being dependent upon the inquiry as to whether the land in controversy was a part of a tract purchased and claimed by plaintiffs in lot 13, or a part of a tract purchased and claimed by defendant in lot 8, adjoining lot 13, according to a subdivision of the west half of the Luke Moore league as made June 15, 1838, by the district surveyor, Henry Trott.

A verdict for Moerer was reversed by this court for error in the charge, on the issue of limitation, in submitting Bray's bayou as the fourth side of an enclosure, if of such nature and depth as to constitute a barrier, when there was no evidence as to the nature or character of the stream. 31 Texas Civ. App., 495.

On second appeal, the Court of Civil Appeals for the Fourth District resolved the issue of boundary as matter of law in favor of the

plaintiffs, and remanded the cause for another trial, solely on the issue of ten year limitation. 39 Texas Civ. App., 75.

At the last trial the case was tried, in obedience to the mandate of the Court of Civil Appeals, solely upon the issue of ten years' limitation. The result was a verdict and judgment for defendant, and plain-tiffs bring the case on a writ of error before this court for revision.

By their first assignment plaintiffs in error complain of the refusal of the court to grant to them a new trial because the verdict was with-out any evidence in its support in finding that the defendant had been, before the commencement of this suit, in peaceable and adverse pos-session of the tract of land in controversy, or some part thereof, claim-ing the whole continuously, for ten years computable in his favor.

Their second assignment is based upon the refusal of the court to give in charge to the jury the first special instruction, to the effect that the evidence, being insufficient in law to sustain the plea of ten years' limitation, to find a verdict for the plaintiffs. These assignments are grouped by plaintiffs in error in their brief, and under them is presented the proposition that the evidence was legally insufficient to show use or enjoyment of the land, or peaceable or adverse possession for the length of time required to sustain the ten years' plea of limi-tation.

Error is predicated upon the refusal of the court to instruct the jury as requested in plaintiffs in error's second special charge, which is as follows: "The evidence is insufficient in law to sustain the ten years' plea of limitation under the facts relating to the enclosure claimed to have existed for a calf pasture, and you will not find for defendants under their plea of limitations on that branch of the case."

The jury being the judges of the facts, the weight of the testimony and credibility of the witness, this court will look no further than to see whether the evidence before them warranted their finding in favor of the defendant in error on his plea of ten years' limitation, and jus-tified the court in submitting that issue to the jury, and if it is found that the testimony most favorable to the defendant warranted the find-ing and justified the submission of the issue, the case must be affirmed.

The evidence shows that the defendant Moerer purchased the east-ern half of lot 8 of a subdivision of the western half of the Luke Moore league in 1855, receiving a deed therefor, in which the land so pur-chased by him was described by metes and bounds. When he bought the land he had it surveyed by Henry Stamm, now dead, who marked the trees, etc.; and defendant has held and claimed the land by the lines this surveyor made, and paid the taxes every year since he bought the land. The land in controversy was embraced within the boundaries surveyed and marked by Stamm, and defendant has continuously, since the date of his purchase, claimed all the land within said boundaries, but as a matter of fact the 43.7 acres in controversy is a part of lot 13 of said subdivision, and not the land embraced in the description in his deed. In 1856 defendant built a fence around approximately one-third of the land in controversy except on the south, and on this line Bray's bayou, which was the southern boundary, was of such a nature and depth as to constitute a barrier for the greater part of the entire length of the line, and where it was not the defendant erected and main-

tained barriers made of poles and plank; and the land so inclosed was continuously used by the defendant as a pasture from the year 1856 until a short time before the storm of September, 1875, when he moved away, and thereafter made no further use of it himself.   The defend-ant testified that he purchased the land in 1855, and built the fence in the year after 1855, and used the land thus inclosed for a pasture. The witness Kuhlman, who was born in 1849, testified that he had known the Moerer place as long as he could remember, that Moerer had no house on it, but had a pasture on the south end of it; that the fence was a rail fence that ran from Kolbow's to Schmidt's fence; could not say how much was inclosed, but it might have been one-third of the land; that the bayou front was not all inclosed; that there were some places where the banks were steep enough, and at shallow places there were posts driven in and poles put up.   These were put there so cattle could not cross at the shallow places; that Moerer used the place mostly for his calves; that he knew that as long as he could remember; thinks he was from six to eight years old when he first knew of the fence being there; that it must have been about the year 1858 when he first knew of the fence; that he knew of the Moerer fence ever since he could remember; that he was raised there on Bray's bayou, and he knew it.

Witness August Kolbow, who lived right next to the land, was born in 1859.   He testified that Moerer had a calf pasture on the land in controversy; that he found the pasture there as far back as he could remember; drove his calves there when he was a boy; was then six or seven or eight years old, big enough to drive calves; that about half of the tract was inclosed; that his father and Moerer used the inclosure to put their calves in; that the fence was all right until the September storm blew trees over it; that witness then re-paired the fence and kept it up for a couple of years after the storm. When Moerer moved away, about 1875, he told witness he, witness, could use the land, and to watch it and keep people from stealing the wood off and that he had patched the fence and used the land for a couple of years after the storm.

C. Moerer, son of the defendant, was 46 years old at the time of the trial.   He testified that he first knew the fence when he was five, six or seven years old; that it stayed there until about 1876; that the fence was a calf inclosure; that it was a calf pasture his father used; that they drove the calves in there every morning.

Mrs. Reichardt, daughter of defendant, 48 years old at the time of the trial, testified that she had known the land since she was eight years old; that she could remember; that her father claimed the land and had a calf pasture on it, between Schmidt's and Kol-bow's; could remember that her father had it in possession from the time she was eight years old up until 1875; that defendant had a calf pasture on it with a rail fence; knew that because she went there twice a day to drive the cattle in when she was a child; that during the time she knew it the fence was kept up all the time and the calves were kept there.

Mrs. Kuhlman, who was also a daughter of defendant, was 50

years old at the time of the trial. Her testimony was substantially the same as Mrs. Reichardt's on the points set out.

From the above statement of the testimony of the witnesses offered by defendant, we conclude, and, in deference to the verdict of the jury, find that the defendant Moerer had and held the continuous, peaceable and adverse possession, use and enjoyment of a part of the land in controversy, claiming the whole, from the year 1856, beginning the last day of said year up to September, 1877; and after deducting the period of suspension of the statute of limitations, commencing January 28, 1861, and ending March 30, 1870, he had and held such actual, adverse, peaceable possession, use and enjoyment for more than ten years computable in his favor. The assignments of error are overruled.

By their fourth assignment plaintiffs in error complain of the refusal of the court to instruct the jury as requested in their third special instruction, which is as follows: "The evidence is insufficient to sustain the defendant's ten years' plea of limitation under the enclosure claimed of the entire land in controversy after the construction of the Halff and Neubouer Bros.' fence at or near the north line of such land, and you will not find in favor of defendant under his plea of limitation on that branch of the case."

Plaintiffs in error contend that there was no evidence, or no more than a scintilla, to show a peaceable and adverse possession and use for ten years, continuous and uninterrupted after the Halff and Neubouer fence went up. As we have heretofore stated, the evidence was sufficient to warrant the jury in finding that Moerer had peaceable and adverse possession of a part of the land in controversy, claiming the whole, from the year 1856 to two years after the storm of September, 1875, the possession of Moerer from the time he moved away before the storm to September, 1877, being maintained by Kolbow. The testimony seems to be uncontradicted that after September, 1877, the fence was allowed to fall and remain down, and from that time until 1887, 1888, or 1889 there was neither possession nor use of the land. As to the time when the land was afterward enclosed and actual possession resumed by Moerer, coupled with use and enjoyment of it, the testimony is conflicting. It also seems to be conceded that the subsequent enclosure, which embraced nearly, if not the whole, of the entire tract in suit, was not erected until about the time, or soon after, the Halff and Neubouer fence on the north was put up. Upon this branch of the case the witness, C. Moerer, testified that about 1888 or 1889 a wire fence was put up at the north end by Halff and Neubouer, and that he fixed up what was open for his father; that in 1888 or 1889 he put wire fence on the east side, "and me and Kolbow fixed that west side fence, and on the north, and on the north Halff and Neubouer put up their fence, and I got permission from Mr. Lloyd (Halff and Neubouer's agent) to join them." On the east side, "at the lower end was a rail fence, and at the upper end was a wire fence I put there;" that that enclosure remains there yet (the date of the trial was January 4, 1906); that Kolbow used it for his horse and the defendant claimed it and paid

taxes on it every year; that from 1888 or 1889 down until now (the time of the trial) the land has been fenced; that Kolbow had charge of it, and has his horses and calves in it, holding it for defendant; that the Halff and Neubouer fence was put up in 1888 or 1889. The witness Mrs. Kuhlman testified that some time in 1888 or 1889 a wire fence was put around the land and that it has been under fence ever since, Kolbow putting his horses and things in it; that Kolbow was not claiming it for himself, but that her father let him have the use of it for a pasture; that when last on the land, about three weeks before the trial, it was fenced as it was in 1889; that her father always claimed the land since she was a child. The witness Kolbow testified that the Halff and Neubouer fence was put up in the last part of the '80's or the first part of the '90's; explained how the land in controversy was enclosed, and stated that he used the land thus enclosed as a pasture and had possession of it at the time of the trial; that when Halff and Neubouer let the fence go down, defendant fixed it up. Charles Schmidt testified that the land was fenced in 1888 or 1889, and that the entire tract was enclosed; that Kolbow used the land enclosed by the fence; that possession has been kept up ever since until the last year or so (before the trial), and that Kolbow used it during that time. The suit was filed in the court below on April 20, 1901.

This evidence warranted the jury in finding in defendant's favor on his plea of ten years' limitation on the second period of limitation, and the court did not err in refusing to give the third special instruction above quoted, unless the continuity of Moerer's possession was broken by the building of a fence on the land by the plaintiffs in error in the year of 1898. As to this the testimony shows, practically without conflict, that in 1898 the plaintiffs in error built a line of fence on the dividing line between lots 8 and 13, from the Halff and Neubouer south line to the bayou, and that afterwards young Moerer went to the plaintiff Cochran and complained about it, claiming the land was his father's, and afterwards, the date not being shown, but soon thereafter young Moerer threw this fence down. The testimony does not show that it was ever rebuilt. As to the building of this fence, J. B. Cochran, one of the plaintiffs in error testified that in 1898 he fenced the tract in suit, building a fence connecting his other fence he had at the north (he had before then purchased the Halff and Neubouer tract), and ran his fence down south to the bayou; that he and Settegast, with the help of a couple of negroes, built this fence. The testimony fails to disclose that, other than building the one line of fence, the plaintiffs in error otherwise took possession of the land or exercised any act of dominion or control in reference to it; nor was it shown that Moerer was dispossessed or that Cochran and Settegast remained on the land; but on the other hand, the evidence shows that they never gained possession, but that the land continued in Moerer's actual possession. (Cobb v. Robertson, 99 Texas, 146.) The facts of the case cited, as set out in the opinion, are as follows: "The evidence bearing upon this point is quite contradictory; the most favorable to plaintiff being that of

George P. Robertson himself. His statement is that before he bought interest of some of the DeMoss heirs, he said to Sorelle and Logan they might buy if they chose, but that if they did not wish to buy he would do so; that they replied that they did not want to buy and that he might go ahead; that thereupon he bought, and in the summer of 1897 went to the land preparatory to fencing it, and ran out a portion of the lines, in doing which he was assisted by Logan, that a few days afterwards he went again, prepared to fence, and while he was building the fence, Logan questioned his right to do so, saying it was all right if he, Robertson, had bought the heirs' title, but otherwise not; that Logan went to the county seat to see if Robertson's deed was on record and returned next day, saying he found no deed to Robertson on record, that he had taken legal advice and objected in violent terms to the fencing. The result of it all was that Robertson extended a fence so as to cut Logan, who lived on the south half of the survey, off from the north half except that by an agreement an opening for access was left in the division fence. Robertson also put material on the north half for a house. In a few days Logan tore down the fence and removed the material." Upon this state of facts the Supreme Court says: "We think it evident that these facts do not sustain the contention that the possession of Logan was broken by the entry and building of the fence by Robertson under the facts stated. Logan continued as before in the actual possession and use of the land, which was otherwise inclosed with other lands, as his pasture, and did not yield possession and was not ejected therefrom by the acts of Robertson. The latter never gained the possession of any part of the land, but the whole continued in Logan's actual possession."

By authority of this decision we hold that Moerer's peaceable possession was not interrupted nor its continuity broken by the acts of Cochran and Settegast in building the fence.

What we have said in disposing of the first, second, third and fourth assignments of error disposes also of the fifth, which complains that the court should have granted a new trial because the verdict was clearly wrong and against the manifest weight or great preponderance of the evidence.

But one other question remains to be disposed of, and that is raised by the sixth assignment of error, which, in effect, charges that the court erred in rendering judgment so as to include for defendant a strip nine feet wide the entire length of the tract, as to which defendant had disclaimed. The court did render judgment in favor of plaintiffs for a strip nine feet wide the entire length of the land, to be taken off the *west* side. Plaintiffs in error contend that the strip should have been taken off the *east* side. The disclaimer was as to a strip nine feet wide "along said dividing line throughout its entire length." The words "dividing line" were used in describing the land claimed by Moerer with reference to both the east and west sides of the tract and the language of the disclaimer does not make it clear as to which of the dividing lines the strip was to be taken. If the lower court misinterpreted the disclaimer the plaintiffs in

error should have sought a correction there, and as they did not they can not be heard to complain here.

There being no reversible error disclosed by the record the judgment is affirmed.

*Affirmed.*

Writ of error refused.