**BILLINGSLEY v. HOUSTON OIL CO. OF
TEXAS.   (No. 6849.) \***

(Court of Civil Appeals of Texas.   Galveston.
Dec. 2, 1915.   Rehearing Denied
Jan. 6, 1916.)

1. ADVERSE POSSESSION ⬥⇒16—WHAT CON-
STITUTES.

Where land lay in a sparsely settled com-
munity and was available only for lumbering
purposes, defendant's predecessor, who built a
logging railroad across the land, cut timber
therefrom and at times maintained feed sheds
and pens for its oxen, and small cabins for its
workmen, had adverse possession of the land
within Rev. St. art. 5674, prescribing a 5-year
period of limitation.

[Ed. Note.—For other cases, see Adverse Pos-
session, Cent. Dig. §§ 82–89; Dec. Dig. ⬥⇒16.

For other definitions, see Words and Phrases,
First and Second Series, Adverse Possession.]

2. ADVERSE POSSESSION ⬥⇒82 — COLOR OF
TITLE—RECORDATION OF DEED.

Rev. St. arts. 6786, 6789, 6790, respective-
ly, declare that county clerks shall be record-
ers, that when any instrument authorized to be
recorded shall be deposited, the recorder shall
enter it, and that the recorder shall, without
delay, record every instrument deposited with
him for record.   Article 6791 declares that every
instrument in writing shall be considered as
recorded from the time that it is deposited for
record; and article 5674 declares that every
suit to recover real estate as against any per-
son having peaceable and adverse possession
shall be instituted within 5 years after the cause
of action accrues, but that this article shall
not apply to one in possession of land who
would deraign title through a forged deed.
*Held*, that a deed, duly deposited with the re-
corder for record, must be considered as re-
corded within the 5-year statute.

[Ed. Note.—For other cases, see Adverse Pos-
session, Cent. Dig. §§ 468–471; Dec. Dig. ⬥⇒
82.]

3. APPEAL AND ERROR ⬥⇒169—ASSIGNMENTS
OF ERROR—CONSIDERATION.

An assignment, not presented in trial court,
cannot be considered on appeal.

[Ed. Note.—For other cases, see Appeal and
Error, Cent. Dig. §§ 1018–1034; Dec. Dig. ⬥⇒
169.]

4. ADVERSE POSSESSION ⬥⇒112—EVIDENCE—
BURDEN OF PROOF.

One relying on adverse possession has the
burden of proving it.

[Ed. Note.—For other cases, see Adverse
Possession, Cent. Dig. §§ 651, 653, 654, 657–
659, 661–663, 665, 666; Dec. Dig. ⬥⇒112.]

5. ADVERSE POSSESSION ⬥⇒85 — PRESUMP-
TIONS.

Adverse possession is to be taken strictly,
and every presumption is in favor of a posses-
sion in subordination to the rightful owner.

[Ed. Note.—For other cases, see Adverse Pos-
session, Cent. Dig. §§ 313, 498–503, 656, 657,
660, 668, 688–690; Dec. Dig. ⬥⇒85.]

6. ADVERSE POSSESSION ⬥⇒57—ACTION—EVI-
DENCE—SUFFICIENCY.

Where defendant set up adverse possession
under the 5-year statute (Rev. St. art. 5674),
evidence *held* insufficient to show that defendant
or its predecessor had for any continuous pe-
riod of 5 years held the land adversely.

[Ed. Note.—For other cases, see Adverse Pos-
session, Cent. Dig. §§ 277, 278, 655, 667, 687;
Dec. Dig. ⬥⇒57.]

Appeal from District Court, Jefferson
County; John M. Conley, Judge.

Action by W. A. Billingsley against the
Houston Oil Company of Texas.   From the
judgment, plaintiff appeals.   Reversed and
rendered.

Minor & Minor, of Beaumont, and Wilson,
Dabney & King, of Houston, for appellant.
H. O. Head, of Sherman, and Parker & Ken-
nerly, of Houston, for appellee.

LANE, J.   This suit was originally in-
stituted by plaintiff, W. A. Billingsley, in
the district court of Hardin county, against
the Houston Oil Company of Texas, and was
transferred to and tried in the district court
of Jefferson county.   This suit was in the
ordinary form of trespass to try title, to one
league and labor of land, originally granted
by the Mexican government to Eduardo Ar-
riola in 1835, situated in Hardin county, Tex.
Judgment was rendered by the trial court
for the defendant, Houston Oil Company of
Texas, for the league of land sued for, less
100 acres out of the northwest corner of said
one league survey, upon its plea of the 5-
year statute of limitation, and for plaintiff,
Billingsley, for the labor of land sued for,
and for all costs of suit.   The case was
tried before a jury upon two special issues
submitted by the court which it answered,
in substance, as follows:   First, plaintiff,
Billingsley, holds title to the land sued for
under Eduardo Arriola, to whom the same
was granted by the Mexican government;
second, the Houston Oil Company of Texas
has matured its title to the league of land
sued for, less 100 acres out of the northwest
corner of said league survey, under the
5-year statute of limitation.   The court hav-
ing withdrawn from the jury any consider-
ation of limitation as to the labor of land
sued for by plaintiff, it was not considered
in the last answer.   Upon such answers the
trial court rendered judgment as hereinbe-
fore stated.   From which judgment W. A.
Billingsley has appealed.

All of appellant's complaints may be stat-
ed in four assignments, the substance of
which are as follows:   First.   That the trial
court erred in holding, and in rendering
judgment for appellee upon, the theory that
the construction of a tramroad, with switch-
es and turnouts every 200 or 300 yards, upon
and across the land sued for, for the pur-
pose of taking and removing the timber from
said land; the cutting and removing of such
timber; the building and using of small
stock pens on said land for the care of the
teams used in hauling said timber, so cut and
taken; the building of small feedhouses
about 10 by 12 feet in size, said pens and
feedhouses being moved from one point to
another on said land as the work of cutting
the timber progressed, is such "adverse pos-
session" of said lands as that term is used
in article 5674, Rev. St. 1911, defining the
5-year statute of limitation; and that such

acts of possession for the requisite number of years would ripen into title by limitation. Second. That the trial court erred in holding, and in rendering judgment for appellee, upon the theory that the deposit of a deed for record with the proper officer for filing and record, and its subsequent filing by said officer as required by law, and as provided by article 6791, Rev. St. 1911, does constitute a deed "duly registered," as that term is used in article 5674, supra, which defines the 5-year statute of limitation, and that it is not necessary that a deed should be actually recorded to meet the requirements of said article 5674. Third. That there was no proof that appellee had paid all taxes due on said land which he seeks to hold by limitation under the 5-year statute of limitation, and therefore he cannot hold under said statute. Fourth. That if it be held that such possession as appellee held to said land was such "adverse possession," as that term is used in said article 5674, supra, still it has no title to the land sued for, as there is no sufficient evidence to show that such possession was continuous for the full term of 5 years. We shall consider these assignments in the order named.

[1] The defendant, Houston Oil Company of Texas, in its answer and cross-bill pleaded that prior to the filing of plaintiff's suit it, and those under whom it claims, had had peaceable, continuous, and adverse possession of the league of land sued for, less 100 acres out of the northwest corner thereof, claiming the same under deeds duly registered, using and enjoying the same, and paying all taxes due thereon, for a period of more than 5 years. The nature of the possession of appellee was shown by the undisputed proof to be as follows: By a warranty deed, not dated, but which was acknowledged December 29, 1891, George W. Hooks and others conveyed to the Hooks Lumber Company, a corporation, 4,328 acres, being all of the league of land originally granted to Eduardo Arriola, less 100 acres belonging to W. B. Kline, situated in Hardin county, Tex. This deed was filed for record in Hardin county December 29, 1891, but not actually recorded until the 12th day of January, 1895, about 3 years after it was filed for record. About 1½ or 2 years from November 17, 1890, the Hooks Lumber Company, a corporation, began the construction of a tramroad, built of cross-ties and steel or iron rails, upon said league of land, and also constructed switches or turnouts every 200 or 300 yards to said tramroad, for the purpose of hauling the timber which it was cutting upon and taking from said land to its sawmill, situated near said land. It also, about the same time, built a stock pen and a small feedhouse on said land near its tramroad and switches, to hold its oxen, which it was using in hauling timber from the land, and for storing feed for said oxen. That said tram-road and switches were extended from time to time as the timber was cut, until they extended entirely across the league of land. The pens and feedhouses were removed and rebuilt upon the land as the work of removing the timber progressed Appellee contends that such uses as shown from these facts constituted such "adverse possession," as that term is used in article 5674, supra. Appellant, Billingsley, insists that such uses do not constitute such possession. We think it is shown that the only practicable uses to which the land involved could have been put, or to which such, or similar, land was being put from 1892 to 1897, by those owning the same, was to take the timber therefrom for manufacturing it into lumber. The country in which this land was situated seems to have been a sparsely settled country from 1892 to 1897 or 1898, the period of time during which appellee claims possession by the acts before stated. In volume 1, Ruling Case Law, pages 694 and 695, it is said:

"No particular act, or series of acts, is necessary to demonstrate an intention to claim ownership. Such a purpose is sufficiently shown where one goes upon the land and uses it openly and notoriously, as owners of similar lands use their property, to the exclusion of the true owner. The owner is, of course, chargeable with knowledge of what is openly done on his land, and therefore calculated to attract attention. But a mere passive possession, without intending to claim the property, is insufficient, regardless of the length of time it continues, or however open, notorious, or exclusive it may have been.

"From what has been stated heretofore it is evident that, in determining what will amount to an actual possession of land, considerable importance must be attached to its nature and the uses to which it can be applied, or to which the claimant may choose to apply it. What is adverse possession is one thing in a populous country, another thing in a sparsely settled one, and still a different thing in a town or village. So what will constitute adverse possession of land not susceptible of being devoted to any profitable use might not necessarily of agricultural land or any other susceptible of being so devoted. What would be effective for that purpose as to lands wholly or partially overflowed by water might not as to a building lot in a city. What would satisfy such purpose in respect to a marsh or swamp, not usually put by the owner to any other use than that of a hunting and fishing ground, might not as to premises of any other character. The governing questions of law, regardless of the character of the premises, are the same in every case; but the question of fact may be presented by evidence in a great variety of ways, according to the circumstances. Thus, while the mere occupancy of pine land would not amount to a possession of it, it is easy to understand that such occupancy, coupled with the making of turpentine on the land, might be a sufficient possession on which to predicate an adverse claim. * * * As a general rule, it will be sufficient if the land is so used by the adverse claimant as to apprise the community in its locality that it is in his exclusive use and enjoyment, and to put the owner on inquiry as to the nature and extent of the invasion of his rights; and this is especially true where the property is so situated as not to admit of permanent improvement. In such cases, if the possession comports with the usual management of similar lands by their owners, it will be sufficient. Neither actual occupation, cultivation, nor residence is neces-

sary where neither the situation of the property, nor the use to which it is adapted or applied, admits of or requires such evidences of ownership."

In the case of Ford v. Wilson, 35 Miss. at page 505, the High Court of Errors and Appeals of Mississippi makes the following recital:

"The doctrine of the Supreme Court of the United States is that, to constitute an adverse possession, there need not be a fence, building, or other improvement made, and that it suffices, for this purpose, that visible and notorious acts of ownership are exercised over the premises in controversy for the time limited by the statute. That much depends upon the nature and situation of the property, the uses to which it can be applied, or to which the owner or claimant may choose to apply it. That it is difficult to lay down any precise rule, in all cases, but that it may be safely said that, when acts of ownership have been done upon land, which from their nature indicate a notorious claim of property in it, and are continued sufficiently long, with the knowledge of an adverse claimant, without interruption or an adverse entry by him, such acts are evidence of an adverse possession, for the consideration of the jury, etc."

In Morrison v. Kelly, 22 Ill. at page 623, 74 Am. Dec. 169, it is said:

"The doctrine is well recognized and established that a man may have the actual possession of real estate without a residence upon it. And it may be actual or constructive; actual, when there is an occupancy, such as the property is capable of, according to its adaption to use; constructive, as when a person has the paramount title, which in contemplation of law draws to, and connects with it the possession. But to be adverse, it must be a pedis possessio, or an actual possession. And to constitute such a possession, there must be such an appropriation of the land to the individual as will apprise the community in its vicinity that the land is in the exclusive use and enjoyment of such person. Trifling acts, doubtful and equivocal in their character, and which do not clearly indicate the intention with which they are performed, cannot be regarded as amounting to possession. But it has been held that neither actual occupancy, cultivation, or residence are necessary to constitute actual possession. Ewing v. Burnet, 11 Pet. 53, 9 L. Ed. 624. And where the property is so situated as not to admit of any permanent, useful improvements, and the continued claim of the party has been evidenced by public acts of ownership, such as he would exercise over property which he claimed in his own right, and would not exercise over property which he did not claim, has been held to be such possession as will create a bar under the statute of limitations. Ewing v. Burnet, 11 Pet. 53, 9 L. Ed. 624. What acts may or may not constitute a possession are necessarily varied, and depend, to some extent, upon the nature, locality, and use to which the property may be applied, and the situation of the parties and a variety of circumstances necessarily have to be taken into consideration in determining the question. They must necessarily be left to the jury, whose peculiar province it is to pass upon the question of possession. Ewing v. Burnet, 11 Pet. 53, 9 L. Ed. 624."

After an examination of the many authorities from other states, the majority of the court has reached the conclusion that the acts of appellee, hereinbefore stated, under the conditions shown by the facts to have existed in the locality or vicinity of the land in question from 1892 to 1898, may constitute "adverse possession," as that term is used in article 5674, Revised Statutes of 1911, which constitutes the 5-year statute of limitation of this state, and we therefore overrule appellant's first complaint.

[2] As before stated, appellant also contends that the filing of a deed for registration by the proper officer should not be held to be "duly registering" said deed, as that term is used in article 5674, supra, which defines the 5-year statute of limitation; that article 6791, Revised Statutes of 1911, which provides that "every such instrument of writing shall be considered as recorded from the time it was deposited for record," does not apply to the deeds mentioned in said article 5674. We are unable to see any reason why such construction as contended for by appellant should be made. The registration of such instruments are made in every case, to give notice, and we can see no reason why the filing of such instruments with the proper officer should be held to be a registration, and be notice to one class of persons dealing with the lands affected by such registration, and not to another class dealing with such lands, though in a different manner from the first class. The articles of the statutes pertinent to the question of registration, and consequent notice, are as follows:

Article 6786:

"The county clerks of the several counties shall be the recorders for their respective counties; they shall provide and keep in their offices well-bound books in which they shall record in a fair and legible hand all instruments of writing authorized or required to be recorded in the recorder's office of their respective counties, in the manner hereinafter provided."

Article 6789:

"When any instrument of writing authorized by law to be recorded shall be deposited in the recorder's office for record, if the same shall be acknowledged or proved in the manner prescribed by law for record. the recorder shall enter in a book to be provided for that purpose, in alphabetical order, the names of the parties and date and nature thereof, and the time of delivery for record; and shall give to the person depositing the same, if required, a receipt specifying the particulars thereof."

Article 6790:

"Each recorder shall, without delay, record every instrument of writing authorized to be recorded by him, which is deposited with him for record, with the acknowledgments, proofs, affidavits and certificates written or printed on the same, and all other papers referred to and thereto annexed, in the order and as of the time when the same shall have been deposited for record, by entering them word for word and letter for letter, and noting at the foot of such record all interlineations, erasures and words visibly written on erasures, and noting at the foot of the record the hour and the day of the month and year when the instrument so recorded was deposited in his office for record."

Article 6791:

"Every such instrument of writing shall be considered as recorded from the time it was deposited for record; and the recorder shall certify under his hand and seal of office to every such instrument of writing so recorded, the hour, day, month and year when he recorded it, and the book and page or pages in which it is

recorded; and when recorded deliver the same to the party entitled thereto or to his order."

Article 6842:

"The record of any grant, deed or instrument of writing authorized or required to be recorded, which shall have been duly proven up or acknowledged for record and duly recorded in the proper county, shall be taken and held as notice to all persons of the existence of such grant, deed or instrument."

Article 5674, defining the 5-year statute of limitation, is as follows:

"Every suit to be instituted to recover real estate as against any person having peaceable and adverse possession thereof, cultivating, using or enjoying the same and paying taxes thereon, if any, and claiming under a deed or deeds duly registered, shall be instituted within five years * * * after the cause of action shall have accrued, and not afterward; provided, that this article shall not apply to any one in possession of land, who in the absence of this article would deraign title through a forged deed; provided, further, that no one claiming under a forged deed, or deed executed under a forged power of attorney, shall be allowed the benefits of this article."

We have searched in vain to find a reported case wherein the identical question here presented has been decided in this state, or elsewhere. In the case of Harrison v. McMurray, 71 Tex. 122, at page 128, 8 S. W. 612, at page 615, the identical question was squarely presented to our Supreme Court, and Justice Walker, speaking for that court, disposed of the question in these words:

"Whether the filing, which for some purposes is equivalent to the actual record, is sufficient as a basis for the claim under the 5-year statute of limitations, or whether the testimony be sufficient to establish the registry of the deed by circumstantial evidence, * * * need not be determined. The jury could not have found against her upon the 10-year statute without a total disregard of the testimony."

Since article 6791, supra, provides that "every such instrument of writing shall be considered as recorded from the time it was deposited for record," and article 6842, supra, provides that the record of any such instrument which shall have been duly recorded in the proper county shall be taken and held as notice to all persons of the existence of such instrument, we do not see how the question can be an open one. We think the language of the statute clearly provides that the filing of such instruments shall be notice of the existence of such deed, to all persons thereafter dealing with lands affected by such instruments, for all purposes.

The case of Carlisle & Co. v. King, 103 Tex. 620, 133 S. W. 241, is one in which Carlisle & Co. were claiming under a deed which had been filed for record with the proper officer in 1892, but which was not actually recorded until the year 1906. King brought suit for the land involved, claiming to be an innocent purchaser for value without notice, contending that the filing of the deed under which Carlisle & Co. held in 1892 was not notice of its existence to him. In that case Chief Justice Brown uses this significant language:

"At first view of the question it would appear that the long time elapsing between the filing of the deed and the purchase by the plaintiff in error in this case would indicate negligence on the part of the person who claimed the land, under the deed from Burns, in failing to see to the recording of his deed properly in due time. When, however, we turn to article 4605 of the Revised Statutes, we find that the Legislature provided for just such conditions as existed here by the enactment of that section in the following words: 'Art. 4605. When any instrument of writing authorized by law to be recorded shall be deposited in the recorder's office for record, if the same shall be acknowledged or proved in the manner prescribed by law for record, the recorder shall enter in a book to be provided for that purpose, in alphabetical order, the names of the parties and date and nature thereof and the time of delivery for record; and shall give to the person depositing the same, if required, a receipt specifying the particulars thereof.' Thus it will be seen that the duty is imposed upon the clerk, upon the filing of each instrument for record, to place it upon a memorandum book, in alphabetical order, so that any person who desired to ascertain whether there was a conveyance of, or an incumbrance upon, any tract of land in the county could readily ascertain that fact by reference to the memorandum book. But the Legislature did not stop there in its provision for the protection of subsequent purchasers, but enacted article 4660, whereby it provided that, 'if any recorder shall neglect or refuse to provide and keep in his office such indexes as required by law, he shall forfeit and pay any sum not exceeding five hundred dollars,' and be liable to the party injured by such neglect for all damages sustained.

"We find no provision of the statute which requires that a party who deposits an instrument for record in the clerk's office of the county shall pay the recording fees before the record is made. Under the provision of the statute which we have before cited, we believe that Throckmorton v. Price was properly decided, and that the filing of the instrument in this case operated as notice to the subsequent purchaser, notwithstanding the fact that a great length of time had elapsed between the filing of the instrument and the purchase. If the clerk did his duty and placed the instrument upon the memorandum book in alphabetical order, then it was no less accessible to the subsequent purchaser in 1906 than it was in the year 1892, and if he failed to keep that memorandum as required by law, he was guilty of negligence for which the defendants in error are not responsible" (citing Throckmorton v. Price, 28 Tex. 606, 91 Am. Dec. 334).

Appellant's second contention is overruled.

[3] No assignment was presented in the trial court upon the question of payment of taxes, and therefore cannot be presented for the first time in this court. We, therefore, are not at liberty to consider such assignment in appellant's brief, and will not do so.

[4-6] We now come to a more serious question, that is, was the possession of appellee, and those under whom it holds, continuous for any period of 5 years prior to the filing of plaintiff's suit? Appellee claims title under the 5-year statute of limitations; that he held possession of the land under two periods of time of more than 5 years each, the first, beginning at the indefinite time of 1½ or 2 years after the execution of a certain deed, of date November 17, 1890, and ending June, 1897, and the other beginning in ——, 1900 and extending 5 years from said date. In support of the possession of

appellee for the first period it relied upon the testimony of the witness G. W. Hooks, who was active in the use of the land for the first period of the possession claimed by appellee. Appellant has, we think, made a fair statement of the substance of the testimony of said witness, in so far as it tends to show the length of time the land was in possession of those under whom appellee claims during the said first period, and we also think that it does not materially conflict with the statement of such testimony as presented in appellee's brief, and we therefore adopt the same as the testimony of said witness, which is as follows:

"G. W. Hooks was called by the defendant, having been associated with Strickland, J. L. Hooks, and others, first as a partnership operating the Hooks Lumber Company, afterwards incorporated. This company had a sawmill, which ultimately cut 50,000 feet, and employed teams and carts, wagons, and had a steel tramroad. This mill was at Hooks' switch, now called Arriola, on the Texas & New Orleans, and was built in 1888, and was situated, with the millhouses, etc., on the Rogers league 250 or 300 yards from the northeast corner of the Arriola league, which the Hooks Lumber Company claimed. This mill was built before the Hooks Lumber Company took the conveyance for 1,107 acres from the Beaumont Lumber Company in 1890, and the deed from A. H. Irvin for 3,221 acres, but the company did nothing at that time to take possession of the league, but that in the course of a year or two built a tramroad on it, and eventually two houses on it, and ox lots and barn. That it must have been in the latter part of '91 or the early part of '92 that the tramroad was started, which ran a little southwest from the mill, and crossed onto the Arriola league, about a mile from the mill, south of the league's northeast corner. The witness could not state when the tram cut across the league, but said that it was pretty well across it in a year and a half or 2 years, during which time the Hooks Lumber Company was cutting timber on the league, and the tram was gradually being extended as the timber was cut, and timber was brought from beyond the league. The tram mostly used pine ties, and the first iron was 30 pounds steel rail, but some of it heavier, with a bridge across Boggy creek. A 10-ton engine was used, and spurs put out to cut into the timber, and that it must have taken 3 years or better, or about 3 years, to cut the timber. After timber beyond the league had been cut, then they came back and finished cutting on the league. The two houses built by the Hooks Lumber Company on the Arriola league were 'built about 1895 or 1896, somewhere, that these houses were built. Somewheres along there, I don't remember positively, and were occupied; not continuously, however. The one in particular that was occupied first by Frank Middleton. He lived in it a few months, and moved out, and it was then occupied by a negro by the name of Jim Holt. Frank Middleton was the engineer. These houses were near where the tram crossed on the line of the league.'

"Hooks further testified: These houses were built for the work people of the company, which had an ox lot near them, and a little feedhouse in connection with it, which ox lot and feedhouse must have been built about the time the tram was built. The work oxen were kept there until the work got more remote, and then an ox lot had to be built further out, near the work. 'I do not know how long that house (feedhouse) was used by the Hooks Lumber Company. We never used any one very long at a time, because we were moving from place to place, and were using one all the time we were cutting lumber.'

Witness said: 'We must have put that tramroad in there about 1893, and it stayed there until 1897 or 1898. I do not remember how long it was after the date of the two deeds to the Hooks Lumber Company in 1890 before the laying of the tramroad had begun. It might possibly have been a year and a half, possibly 2 years, a year and a half, about, I think. Yes, sir, a year and a half or 2 years.' The operation was continuous until about the time the tram was taken up, which was in about 1897 or 1898. The mill cut logs from other sources. Logging crews were kept in the woods. When the company was incorporated, he became president, and it was incorporated shortly before December 29, 1891, and the Hooks Lumber Company claimed the survey. The witness knew Tobe McKinney, and it must have been about 1896 that McKinney first moved on the Arriola league, but the witness corrected this by saying that McKinney may have moved on after Turner was appointed receiver of the Hooks Lumber Company. McKinney lived in one of the little houses on the league described. 'I think he got permission from Turner to go there, but if I know, I have forgotten. McKinney stayed in one of these houses until his death. He was killed. He was a maker of ox bows.' Apparently trees had been cut on the league before witness' company claimed it.

### "Cross-Examination by Plaintiff.

"Hooks testified that there had been a suit between the receivers of the Houston Oil Company, the defendant here, as defendants, and a Mrs. McKinney and others as plaintiffs, taken up before the master in chancery, Gov. Sayers, in which witness Hooks had testified at Houston as to the same matters of possession and occupancy to which he now testifies, and had been asked very much the same questions he was now asked, and had given this testimony before Gov. Sayers as master perhaps over 5 years ago, when he said his recollections would be more precise, because he was closer to the event, and that his testimony had been taken down; that he had testified before Gov. Sayers as master that McKinney did not move onto the Arriola league while the Hooks Lumber Company was operating, and that that is correct, to the best of his recollection, and that he had testified before the master, and that with the exception of the tram, feedhouses, and ox houses, and the two little houses, the Hooks Lumber Company never had anything on the Arriola league except the tram, ox lots, feedhouses and two little houses. These two little houses were about 30 feet long by 24 feet wide, regular mill-hand houses. Fountain moved one of them off. Middleton, who ran the tram engine, lived in one of them—it might have been six months, it might have been a year, but the witness thought not less than six months. In the other a negro named Holt lived 'up to a few months before McKinney moved in.' Jim Holt may have lived in one of the houses four, five, or six months. The witness could not find the books of his company showing when he bought the tram iron, etc.

"The testimony of the witness given before Gov. Sayers, which had been preserved, was then read to the witness, and he stated that the feed pens stood only while the tram was in use, verifying his previous testimony, and also, he verified his previous testimony as follows: That there was a feedhouse and lots on the league while the timber was being cut by the Hooks people, and existed only while the tram was in use; that it took something like 3 or 4 years to cut the timber. 'Well, it was something like 3 or 4 years we had a tram on it.' The witness was asked if this statement was correct, and he answered: 'Yes, sir; yes, I said that is correct.' He proceeded with a verification of his testimony before the master: 'Then your actual possession ceased on the Arriola

league at the end of 3 or 4 years? A. Yes, sir; that is, we had put these houses on there. Is that correct? You put those houses on there in 1896, did you not? A. About that time; yes, sir.' It was again read to the witness, and he verified his previous statement that the actual possession ceased on the Arriola league at the end of 3 or 4 years. The feed and stock pens were just little box houses, in which the feed was put for the oxen or other live stock, and they were shifted as the operations extended, or new ones would be built. 'Yes, sir; you might call them temporary structures. Yes, they were intended to be shifted. Posts were driven down and planks nailed on there. When we moved them, we knocked the planks off,' and the posts were pulled up. The ox pens were about 100 or 150 or 200 feet square. There were no sheds for cattle. The structures to hold the feed were 10 or 12 feet square. One of the houses, the one occupied by Middleton, is still standing, 'and the previous testimony, given by the witness before the master in the previous litigation, to the effect that nobody lived in that house except from in 1896, is correct.' Middleton lived in it and Holt lived in it, and it was vacant part of the time, and then McKinney lived in it, Middleton, about six months. The Hooks Lumber Company became insolvent, and was placed in the hands of a receiver, the witness thought, in the latter part of 1897, but some time in 1897. He testified before Gov. Sayers that McKinney lived in the Fountain house, but as a matter of fact McKinney lived in the Middleton house. Tobe McKinney told witness that he bought the house from Fountain. Being re-examined by the defendant, witness Hooks said that he testified on direct examination that the tramroad had been begun not exceeding 2 years from the date of the deeds in 1890; that the best way he can state it is that the tram was built about 1½ or 2 years after the land was bought, and torn up in 1897. Being re-crossed by defendant, he stated: 'Q. Then the tram and the stock pens or feed pens you spoke of standing there were used only while the tram was in use? A. Yes, sir. Q. Did that exceed 2 or 3 years? A. Well, we had a feedhouse and lots on it all the time we were cutting the timber off of it, and it took something like 3 or 4 years to cut the timber. Q. Not exceeding 4 years? A. Well, I know other timber extending beyond there—well, it was somewhere like 3 or 4 years we had a tram on it. Q. That is the part you referred to as being substantially correct? A. Yes, sir.'"

This testimony, if taken as true, does not establish continuous, adverse possession of the land in question for a period of 5 years next preceding the removal of the tramroad, feedhouses, and stock pens of the predecessors of appellee, with that clear and definite proof demanded in such cases as this, if, indeed, it establishes such possession for a period of 5 years. There was some other testimony upon this issue by other witnesses, but it falls very far short of proving the possession of the land for 5 years, claimed by appellee, and, when taken together with the testimony of Hooks, it fails of the purpose for which it was offered.

"In accordance with a familiar rule the burden of proof rests on him who has the affirmative of an issue, the party relying on a title by adverse possession has the burden of proving all the facts necessary to establish such title. Adverse possession is to be taken strictly, and every presumption is in favor of a possession in subordination of the rightful owner. Title by adverse possession, therefore, must be establish-

ed by clear and positive proof. It cannot be made out by inference." Ruling Case Law, vol. 1, page 695.

We do not think appellee has made proof of such adverse, continuous possession of the land involved for the first of said periods as would give it title thereto, under the 5-year statute of limitations. We have carefully examined all the testimony introduced relative to the adverse possession of said lands, claimed by appellee, or those under whom it holds, during the said second period, and have reached the conclusion that such testimony wholly fails to show such adverse and continuous possession as would give title by limitation under the 5-year statute of limitations.

The majority of the court, therefore conclude, that as the trial jury found by their verdict that appellant, W. A. Billingsley, held the legal title to the land sued for, and, as appellee has failed to make such proof of its adverse, continuous possession as would entitle it to hold the land sued for under the statute of limitations, and as it seems that the case was fully developed by the testimony introduced, that the judgment of the trial court should be reversed, and that judgment should be here rendered for appellant, W. A. Billingsley, for the league of land sued for by him, same being the only land involved in this appeal; and it is so ordered.

Reversed and rendered.