DARGAN et al. v. KEYSTONE MILLS
CO. et al.

No. 2448.

Court of Civil Appeals of Texas. Beaumont.

Nov. 14, 1933.

Rehearing Denied Nov. 22, 1933.

Hill, Hill, Randolph & Hughes, of Conroe, for appellants.

Vinson, Elkins, Sweeton & Weems, of Houston, and Foster, Williams & Nicholson, of Conroe, for appellees.

WALKER, Chief Justice.

This appeal involves the title to 550 acres of land on the Lemuel Smith survey in Montgomery county. The action was in trespass to try title, with Keystone Mills Company and Charles D. Stephens as plaintiffs, and appellants, the heirs of James T. D. Wilson, as defendants. Plaintiffs claimed the land by metes and bounds, pleading their chain of title specially, and specially pleading the several statutes of limitation. James T. D. Wilson held as a remote grantee under the original grantee, and it was the theory of appellants that the subsequent conveyances through which appellees hold were absolutely void because of defects in the description of the land conveyed. The deeds thus attacked by appellants constitute essential links in appellees' chain of title. On trial to the court without a jury, judgment was for appellees for all the land in controversy. The findings of the court necessarily include the findings

for appellees on their pleas of the statutes of limitation of five and ten years.

We quote, in substance, from appellees' brief the following summary of the testimony on the issues of limitation. Beginning with 1913, appellees held under deeds which appellants conceded on oral argument sufficiently identified the land to support the pleas of limitation. In addition to the 550 acres of land in controversy, these deeds covered 400 acres of land not in controversy on this appeal. It was clearly shown that appellees regularly assessed and regularly paid the taxes on the land in controversy in strict compliance with the five-year statute of limitation. Appellee Keystone Mills Company received a deed conveying said tract of 950 acres on January 29, 1913, and it was filed for record and recorded on March 21, 1913. In January of that year the company staked out its tramroad from the mill at Waukegan down southward through the Lemuel Smith survey, and as far as the Hamlett survey. The construction of the mainline tramroad was at once begun and reached and crossed the Smith survey in 1913, one of the witnesses fixing the time as in June, July, or August of that year. In constructing the railroad the company cleared up the right of way, graded the portions necessary, built the necessary bridges, laid the cross-ties, and placed thereon 35-pound steel rails, switches, spurs, turnouts, etc. As soon as the railroad was built the company began to cut its timber on the Smith survey and hauled it to the mill over the railroad and, in doing so, at least six trains, and sometimes more, a day, passed over the road at least six days a week, and sometimes on Sunday, continuous and without intermission, until they cut out their timber south of the mill—the last cutting shown to have been in June, 1924. The railroad was dismantled and the rails removed in the fall or winter of that year. During the whole of the period from the beginning of the construction of the railroad in the early part of 1913, until the company stopped the logging operations in June, 1924, it continuously employed two track crews, consisting of from five to seven or more in each crew, using hand cars, in constructing, maintaining, and keeping in repair said railroad. In connection with the operation of said railroad and its trains the company cut and removed all of the timber on its lands in the Lemuel Smith and Alphonso Steel surveys, as well as other surveys in that vicinity, and, in doing so, constructed or maintained pens or corrals on those lands for the holding and feeding of forty mules and three horses. One of these pens was on the land in controversy in the Smith survey for several years (about two and one-half years). To feed its mules and horses the company built a spur track from the main line and placed

and kept thereon a "feed car" adjacent to the mule pen (as long as the mule pen was maintained). From the time the company bought the timber from R. D. McDonald (January, 1913) down to the present time, it maintained a caretaker who frequently and continuously patrolled its lands (including the land in controversy) and kept the lines well marked and kept trespassers therefrom. During the period of the logging operations above referred to, the land in controversy, together with the land adjacent thereto, was pine timber land, the chief value thereof being the timber thereon, said lands in that vicinity being very sparsely settled, there being only one family residing on the 3,000 acres owned by the company; one of the witnesses stated that the land in that vicinity was not fit for farming. The testimony shows that from the time it bought the land in controversy and timber thereon, up to the present time, the company claimed the title thereto and assessed and paid the taxes thereon each year from 1914 to 1932, inclusive, before delinquency; and assessed and paid the taxes on its railroad and appurtenances each year from 1914 to 1924, inclusive, before delinquency.

### Opinion.

This case involves the force and effect of a possession of the land by appellees through the construction, maintenance, operation, and use of the tramroad across the eastern end of the land in controversy for a period of more than ten years. The construction of a "tramroad possession," as constituting an adverse possession within the meaning of our statutes of limitation, was fully discussed by the Commission of Appeals in Houston Oil Co. v. Billingsley, 213 S. W. 248, followed by this court in McCarthy v. Houston Oil Co., 221 S. W. 307, 308 and Niles v. Houston Oil Co., 288 S. W. 614. See, also, our opinion in Furlow v. Kirby Lmbr. Co., 53 S.W.(2d) 642, 643. We think the holding of the Commission of Appeals in the Billingsley Case warrants the conclusion that adverse possession evidenced only by the use of the land for tramroad purposes may be sufficient, under certain circumstances, to mature a limitation title. We cite the following attendant circumstances as supporting the tramroad possession: (a) Appellees were not mere disseizers or intruders, but entered under a claim of right, evidenced by a chain of title extending back to the original grantee. In Whitehead v. Foley, 28 Tex. 284, it was said: "There is a generally recognized, obvious, and important distinction between possession taken by a mere naked disseizor or intruder—that is, one who enters without claim or color of title—and a possession taken by a person under a colorable title." (b) From 1913 appellees held under recorded deeds sufficient to give constructive notice to the world that they claimed to the extent of their boundaries, as described in the deeds. 2 Tex. Jur. 182; Holland v. Nance, 102 Tex. 183, 114 S. W. 346. (c) The taxes were regularly assessed and paid by appellees. (d) They marked out and renewed from time to time the boundary lines around this land, kept a watchman who had general supervision of all of their lands, and visited this land regularly for the purpose of keeping off trespassers and of asserting for appellees their claim to the land. (e) Appellees were in actual use and occupancy of all the land about two years or more in cutting off the timber. (f) During the timber cutting period spur tracks were run from the main tram line into the timber for the purpose of removing it. (g) For more than two years during the limitation period appellees maintained upon the land stock pens in which they kept their mules and spur tracks upon which they kept feed cars, etc. (h) Appellees' testimony would support the conclusion, quoting the testimony of one witness, that "the land was not fit for farming; the sawmill men bought the land, the timber and all; there were few cattle in that section of the country and though the land may have had some other value except for timber, its chief value was for timber." This conclusion would describe the land generally in the section of country where the land in controversy is situated and, as shown by the general statement given above, there was practically no farming in that section of Montgomery county during the period when appellees were operating their tram line. Under the construction given this character of testimony by the Commission of Appeals in the Billingsley Case, supra, appellees occupied, used, and enjoyed the land for more than ten years for the purposes to which it was primarily adapted, thereby bringing themselves within the rule of adverse possession, as announced in Nona Mills Co. v. Wright, 101 Tex. 23, 102 S. W. 1118, 1121, where it was said: "To constitute adverse possession, the party occupying the land must in some way appropriate the land for some purpose to which it is adapted." The authorities cited abundantly support the conclusion of the trial court that appellees had perfected their title under both the five and ten years statutes of limitation (Rev. St. 1925, arts. 5509, 5510).

It follows that the judgment appealed from should be in all things affirmed, and it is accordingly so ordered.

Affirmed.

COMBS, Justice (dissenting).

With due deference to the opinion of my brethren, I cannot agree that the mere continued operation of the tramroad across the land in controversy, after all timber cutting on the land had ceased, constituted that "actual and visible appropriation of the land" required by our statute of limitations as a basis of adverse possession.

As indicated by the majority opinion, appellees were in actual use and occupancy of all of the land only about two years of the claimed limitation period, cutting and removing the timber. This was at the beginning of the period of limitation. When the timber cutting ceased on the land in controversy, the tramroad was extended onto other lands and all timber operations transferred thereto. From that time on appellees did not possess or use the land in controversy for any purpose for which it was adapted unless the continued operation of the tramroad across it constituted such possession and use.

I think the majority opinion extends the so-called doctrine of "tramroad possession" much farther than our courts have ever extended it. The cases cited in the majority opinion do not, as I construe them, support the holding there made. The leading case of Houston Oil Co. v. Billingsley, 213 S. W. 248, 249, by the Commission of Appeals, does not hold that the mere continuous use of a tramroad across a tract of land by a limitation claimant, unconnected with any use of the land for some purpose to which it is adapted, constitutes such possession as the statute of limitations contemplates. The facts of that case as set forth in the opinion of the Court of Civil Appeals (182 S. W. 373) shows that the league of land involved had been entirely cut over, the timber cutting lasting for three or four years; tenants had lived on it; stock pens had been maintained on it at different times, and the tramroad built onto it and operated thereon, all as incidents of the possession and use of the land for cutting and removing the timber therefrom. These acts of ownership were held to be a sufficient possession to mature title by limitation, provided the possession was continuous, and that "some evidence is presented tending to show that 5 years continuously intervened from the time entry was first made on the league until the occupancy was wholly abandoned." It is evident from the opinion that the Commission of Appeals considered the building and operating of the tramroad mere incidents of the use and occupancy of the land for cutting and removing the timber. Viewed from that standpoint, the building of the tramroad onto the land in preparation for cutting the timber marked the beginning of the possession as effectively as the clearing of land or the building of a fence would have done had the adverse possession been based on the cultivation and use of a farm on the land. And the removal of the tramroad after the timber cutting ceased marked the final abandonment of the possession. In Houston Oil Co. v. Niles (Tex. Com. App.) 255 S. W. 604, the question decided was not the effect of "tramroad possession" at all. The possession was by tenants, and the case involved a construction of the tenancy agreements under which they held. On the second appeal of

that case this court held the above-mentioned decision of the Commission of Appeals to be the law of the case on the limitation issue. Niles v. Houston Oil Co., 288 S. W. 614. The matter of "tramroad possession" is only incidentally referred to in the opinion in connection with the discussion of the admissibility of certain testimony. Points 2–4, page 616 of 288 S. W. In Furlow v. Kirby Lmbr. Co., 53 S.W.(2d) 642, this court held merely that entry by the true owner upon the land in controversy by the building of a tramroad for the purpose of cutting and removing the timber had the effect of ousting the possession of naked trespassers down to their inclosures.

Thus none of the cases cited goes further than to hold that the building and operating of a tramroad by a limitation claimant may be considered as possession when the building and use of such tramroad are coupled with other acts of ownership showing an actual and visible appropriation and use of the land for some purpose to which it is adapted, such as the cutting and removing of the timber.

In the case before us the tramroad was only used in connection with the cutting of timber on the land in controversy for about two years. It was then extended onto other lands and thereafter used exclusively in connection with timber operations thereon. As I view it, when appellees ceased to use the tramroad in connection with the cutting and removing of timber from the land in controversy and began to use it as a means of cutting and removing timber from other and different lands, such operation of the tramroad became an incident of the new possession. It no more evidenced thereafter an intention on the part of appellees to claim the whole 550 acres involved in this suit than the operation of a standard steam railroad or a private road or passageway across it would have. It subjected the land to no use other than as a passageway for the tram in gaining ingress and egress to and from the scene of the new operations. It remained on the land in controversy only because appellees desired to use it as a means of cutting and removing to their mill timber from lands which lay beyond it. It amounted, therefore, to an "actual and visible appropriation" only of the right of way occupied and used in the maintenance of the tramroad. It was in no sense a possession of the whole tract.

Nor, as I view it, did any one or all of the other acts of ownership enumerated in the majority opinion have the effect of extending the possession to the whole tract. True, appellees had recorded their deed describing the whole tract. This was evidence of the adverse character of the claim and of the extent of the claim. Randolph v. Lewis (Tex. Com. App.) 210 S. W. 795. But it was not notice of the claim. The presumption of no-

tice visited upon the owner arises from the possession and hostile use of the land. Holland v. Nance, 102 Tex. 185, 114 S. W. 346; Burton v. Holland (Tex. Civ. App.) 278 S. W. 252, 254; Gibbs v. Barkley (Tex. Com. App.) 242 S. W. 462, 467. The marking of the lines was not possession. Even had appellees built a fence on the land, such fencing would not have constituted possession in the absence of use and enjoyment of the land. Cochran v. Moerer, 47 Tex. Civ. App. 372, 105 S. W. 1138.

Such "tramroad possession" as is shown in this case is, I think, far short of being that open, visible, and notorious possession which raises a presumption of notice to the true owner that a claim is being asserted adverse to his, so patent that he could not be deceived, and "such that, if he remains in ignorance of, it is his own fault." Houston Oil Co. v. Stepney (Tex. Civ. App.) 187 S. W. 1078, 1084.

There are other theories in this case not discussed in the majority opinion, upon which appellees have asked that the judgment of the lower court be affirmed. But all members of this court agree that they are without merit. As I understand the majority of the court, the judgment of the lower court is affirmed only upon the issues of limitation of five and ten years. As I cannot concur in their disposition of these issues, it follows that, as I construe the record, the judgment of the lower court should be reversed, and judgment here rendered for appellants.