## GULF, C. & S. F. RY. CO. v. COFFMAN.
### (No. 591.)

Court of Civil Appeals of Texas. Waco.
March 29, 1928.

On Rehearing. Dec. 20, 1928.

he claimed to have suffered by reason of his residence located on his farm being burned in July, 1921. In September, 1923, M. M. Coffman was adjudged of unsound mind, and R. C. Coffman, his son, was appointed guardian of his person and estate. In November, 1925, M. M. Coffman died, and Deck Coffman was appointed executor of his estate, and, as such executor, substituted himself as plaintiff in this cause. M. M. Coffman and wife owned 700 acres of land near Crawford adjoining appellant's right of way. Mrs. M. M. Coffman died prior to the time of the fire in controversy, and M. M. Coffman was at said time 81 years of age. R. C. Coffman, as guardian, filed an amended petition, in which he claimed $4,000 damages, being the alleged value of the house and furniture destroyed, and, in addition thereto, sought to recover $100 per month for the loss of the value of its use and occupancy. After the death of M. M. Coffman, appellee, as executor of his estate, amended said petition, and claimed as damages one-half of the value of the house and furniture destroyed, with 6 per cent. interest on the total value of the house from the time of the fire until the death of M. M. Coffman in November, 1925, and 6 per cent. interest on the half belonging to M. M. Coffman until the time of trial. He claimed the value of the use of the house during M. M. Coffman's lifetime was 6 per cent. interest on the total value of the house. The heirs of M. M. Coffman joined in the amended pleading filed by the executor and claimed damages to the extent of one-half the value of the house destroyed, and 6 per cent. interest thereon from the date of the death of their father. The trial court instructed the jury to return a verdict for appellant against the heirs on the ground that their claim was barred by the statute of limitation, and there is no appeal from this portion of the judgment.

The cause was submitted to a jury on special issues. The jury found that the reasonable value of the house at the time of the fire was $2,500 and the reasonable value of the furniture at said time was $300, and found the amount of interest on each of said items from the time of the fire up to the date of trial. The trial court entered judgment for appellee for $1,400, being half of the total value of the house and furniture destroyed and 6 per cent. interest thereon until the date of M. M. Coffman's death in November, 1925, and 6 per cent. interest on one-half thereof from his death to the date of trial.

To make a proper disposition of this cause, it is necessary to determine what was the measure of damages to which M. M. Coffman was entitled by reason of the house occupied by him as a homestead being burned. As we construe the law, at the time Mrs. Coffman died, her husband, M. M. Coffman,

Nat Harris, of Waco, and Terry, Cavin & Mills, of Galveston, for appellant.

Kyle Vick and Williams, Williams, McClellan & Lincoln, all of Waco, for appellee.

BARCUS, J. This suit was originally instituted by M. M. Coffman against appellant on January 31, 1923, to recover damages which

had the right to the use and occupancy and was entitled to the rents and revenues during his occupancy of the homestead, being the property on which the residence in controversy was located. He owned an undivided one-half interest in the property, and his children owned the other one-half interest, subject to his right to occupy and enjoy same during his lifetime. M. M. Coffman therefore had a twofold interest in the property—one, the right to use, occupy, and enjoy same, and the other the right to the undivided half interest. He had the power to abandon or renounce his right to occupancy and have the property divided in kind, or, if he abandoned same as his home, his children would have the right to have the property partitioned. The measure of damages for the destruction of the property was unquestionably the value thereof at the time same was destroyed. The method by which this value should be ascertained is a more difficult question. The measure of damage for having been deprived of the use and occupancy of the house should be measured by the value of the use of the property destroyed during the time that M. M. Coffman was deprived thereof. In Lucas v. Lucas, 104 Tex. 636, 143 S. W. 1153, our Supreme Court held that, where the homestead occupied by the surviving widow had been by condemnation proceedings taken away from her for city purposes, the widow was entitled to have said funds derived therefrom reinvested in a home for her to occupy during the remainder of her life. In that case the survivor had no interest in the property, except her life estate. Not only is the survivor entitled to the use and occupancy, but he is also entitled, while he is occupying the premises, to the rents and revenues derived therefrom. Ruble v. Ruble, (Tex. Civ. App.) 264 S. W. 1018, and authorities there cited. The rule seems to be well established that, where a party is deprived of the use of property, his damage is the value of the use thereof to him for the length of time he was deprived thereof. 17 C. J. 785; Powell v. Hill (Tex. Civ. App.) 152 S. W. 1125; Galveston-Houston Electric Ry. Co. v. English (Tex. Civ. App.) 178 S. W. 666; Moore v. King, 4 Tex. Civ. App. 397, 23 S. W. 484; Railey v. Hopkins, 50 Tex. Civ. App. 600, 110 S. W. 779. We think, unquestionably, that M. M. Coffman's measure of damage for having been deprived of the use and occupancy of the residence was the value of its use to him. The trial court's judgment with reference to measure of damages accruing to M. M. Coffman for having been deprived of the use of the property was arbitrarily fixed at 6 per cent. interest on the total value of the property destroyed as found by the jury. Appellant objected to this measure of damages being applied, and we think said objection should have been sustained. The rule applied by the court, in some instances, might be just and a fair compensation. In others it might be a very unjust standard for the measurement of damage. If the residence was worth $100,000, the recovery would be equivalent to $6,000 per year. If, on the other hand, it was worth only $1,000, the recovery would be only $60 per year. We think the better rule is the value of the use of the property to the party who has been deprived thereof. The record shows M. M. Coffman was 81 years of age at the time of the fire, and that 2 years later he was adjudged of unsound mind, and, at the time of his death in 1925, he was 85 years of age. The use of the property to him might have been much more valuable or much less valuable than to persons under different conditions and circumstances.

■ Appellant contends that the trial court committed error in allowing the jury to fix, as the measure of damages for the destruction of the house, the reasonable value thereof at the time of the fire. It contends that the true measure of damages for the total destruction of a house is the difference in the market value of the entire premises with the house thereon immediately before the fire and without the house immediately after the fire. We overrule appellant's contention. The record shows that the house which was destroyed was located on a 700-acre farm. While our courts hold that a proper rule by which to establish the damage for the burning of a house is to ascertain the value of the premises immediately before and immediately after the fire, still they hold that this is not the exclusive method of establishing the value of the house destroyed. Taylor v. Gossett (Tex. Civ. App.) 269 S. W. 230 (error dismissed); M., K. & T. Ry. Co. v. Mitchell (Tex. Civ. App.) 166 S. W. 126 (error refused); Independent Shope Brick Co. v. Dugger (Tex. Civ. App.) 281 S. W. 600.

■ Appellant complains of the action of the trial court in permitting the court stenographer to read in evidence the question and answer testimony of R. C. Coffman, given on a former trial. It appears that at a former trial the witness R. C. Coffman was present and testified, and his testimony was taken down by the official court reporter. At the time of the trial from which this appeal is prosecuted, R. C. Coffman was dead. The objection of appellant goes to said testimony as a whole, on the theory that the question and answer testimony of a witness is not admissible, but only the narrative statement thereof can be reproduced. Appellant does not contend that the testimony had not been accurately transcribed, or that the witness did not testify as shown by said stenographic report. We overrule appellant's contention. We think no better reproduction of the testimony of a witness could be had than by having the official court reporter transcribe same in the exact language of the witness. Cooper v. Ford, 29 Tex. Civ. App. 253, 69 S. W. 487; Smith v. State, 60 Tex. Cr. R. 293,

131 S. W. 1081. As to whether all of said testimony was admissible is not necessary for us to, and we do not, determine, since the objection went to the testimony as a whole.

Appellant contends that the finding of the jury that the house was of the reasonable value of $3,000 at the time of its destruction is so overwhelmingly against the weight of the testimony that said finding should not be permitted to stand; and further contends that the witness R. C. Coffman was not qualified to testify as to the value thereof. The only testimony offered by appellee with reference to the value of the house was by the witness R. C. Coffman, who was a party to the suit. He testified that he was a carpenter, blacksmith, and farmer and had been for 30 or more years; that he had built some houses and figured on some contracts to build; that he had never figured on a completed job, including papering and painting. He testified that the house which was burned was a boxed house, weatherboarded and ceiled; that it had two front rooms 16 by 16, with hall between, and two shed rooms attached 8 by 16, and then an ell built on behind, 14 by 28, divided into two rooms 14 by 14; that one of the 14 by 14 rooms was used for a kitchen and one for a smokehouse, and that there was a gallery along the front of the house 8 feet wide and 40 feet long. He testified that the sills and floor joists were made of hewn logs, and that the rafters were made of cedar poles; that part of the house had been built more than 50 years, and all of it had been there for from 35 to 40 years; that the house had been refloored about 12 years before the fire, and repainted about 6 years before; that he thought the reasonable price for the house at the time of the fire was $3,000. The only other testimony with reference to the value of the house was that by Mr. Cantrell, a contractor, who testified that he was familiar with the cost of building material and labor for building houses, and that a house of the size and dimensions as that burned could have been rebuilt new at the time of the fire, or at any time since, for a price not exceeding $1,927.84, and he testified that he as a contractor would build said house new for said price. There was no testimony that in any way contradicted or questioned that of Mr. Cantrell that a new house of the same dimensions could be built for $1,927.84.

■ The cardinal rule for the determination of damages inflicted upon one party by another is that of compensation. In some instances, the value of a house may be much less than its cost, and, when this is the condition, the parties should not be entitled to the cost of rebuilding. Pacific Express Co. v. Lasker Real-Estate Ass'n, 81 Tex. 81, 16 S. W. 792; T. & N. O. Ry. Co. v. Jeff Chaison Town-Site Co. (Tex. Civ. App.) 290 S. W. 892; Id. (Tex. Com. App.) 298 S. W. 399; Chicago, R. I. & G. Ry. Co. v. Zumwalt (Tex. Com. App.) 239 S. W. 912. In some instances the house might be worth more than the original cost. There is, however, no rule for ascertaining the damage occasioned by having a house destroyed which allows a party to recover more than it would actually cost to replace the property. The house in controversy, by reason of its age, and the fact that it was built in the pioneer days of hewn timbers, may, to the family, have a sentimental or fanciful value, and this may have unconsciously influenced the witness R. C. Coffman, who was a party at interest, and who had spent his childhood in the house, and caused him to fix the value of the house at more than it would actually cost to replace it. Since this cause must necessarily be reversed for other reasons, we do not think it is necessary to determine whether this issue is so against the weight of the evidence as to require a reversal. The parties will have opportunity to strengthen the testimony with reference to the value of the house on another trial.

■ Appellant contends that the finding of the jury that the fire which destroyed the house in controversy was caused by the escape of sparks or fire from appellant's engine is so much against the weight of the testimony that same should not be permitted to stand. We sustain this assignment. The house that burned was located not far from the southwest corner of a tract of Johnson grass which surrounded the house, and which had been some 30 days before mowed for the purpose of being burned. The house was about 100 yards from the railroad track. The fire occurred in the afternoon of July 19, 1921. The nearest point to which the fire burned on appellant's right of way was almost opposite the house, and, if the fire started at that point, it was not more than 100 yards to where the house was standing, and, from the testimony, the wind was blowing from said point almost directly toward the house. The train dispatchers at Temple and Cleburne, being the nearest division points to the south and north of said railway from where the fire occurred, and several of the agents between said two points were placed on the stand, with the records which they kept at said time; and each of said witnesses testified that no train passed appellee's place on the afternoon when the house was burned prior to the time of the fire. The only witnesses who testified that they saw a train on appellant's road on the afternoon of the fire were Letha Alexander, Mrs. E. R. Alexander, and A. D. Black. Letha Alexander at the time of the fire was a girl 13 years of age. She was chopping cotton on the opposite side of the railway an indefinite distance therefrom and from a quarter to a half a mile from the scene of the fire. She testified she saw a short freight train going north, and a short time thereafter she noticed a fire on the right of way down toward the Coffman house; that in about 30 minutes she saw the house on fire; that she saw some section men on the

railroad track; that, after she saw the house was on fire, she went home and reported it to her father and mother, but neither of them went to the fire.

Mrs. Alexander testified that on the date of the fire she lived on the Costley farm, adjoining the Coffman farm, on the west side of the railway track; that, after lunch that day, she went to Crawford for some groceries; that, when she returned home, her telephone bell was ringing, and she was told by one of the neighbors that Mr. Coffman's house was afire; that, when she was coming home from Crawford, she saw a train going north; that she had her three children with her in the buggy; that, after the train went north, she went to the haypress, and stayed a few minutes, and then went home, and then went to the fire. This testimony was given on the last trial, which was had in March, 1927. She testified that she had been a witness in each of the other trials in former years, and had never before testified to having seen a train on the railway track the day of the fire; her explanation thereof being that she had not been asked relative thereto.

A. D. Black, a kinsman of the Coffmans, testified that he lived at Patton, 3 miles south of Valley Mills, and about 5 miles from Mr. Coffman's, in 1921, at the time of the fire; that about 2 o'clock in the afternoon that day he went on horseback to his brother's house, who lived on the Coffman farm; that in leaving his home he had to cross the railroad track, and at that time he saw a freight train going north; that, when he got down the road about a mile or a mile and a half, he saw heavy smoke on the Coffman farm; that he was about two and a half or three miles from the fire when he first discovered the smoke; that it took him about an hour to go to his brother's house; that he had been at his brother's house about 20 or 30 minutes when he first noticed the house was on fire; that he and his brother then went over to the fire. He testified that he had lived in that community all these years, was a kinsman of the Coffmans, and had never testified in the case before; that he did not tell any one about having seen the train before the first trial; that before the second trial he did tell Mr. Coffman, but that he was not used as a witness in any of the former trials.

Mr. Sterling, the only other witness who testified to having seen the fire prior to the time the house was burning, did not claim that he saw any train. He testified that he was hauling hay on the farm directly opposite the Coffman house and on the west side of the track, the Coffman house being on the east side of the track; that he first noticed the fire on the dump on the right of way; that, after he saw the fire, he finished loading a load of hay, and carried it about a mile to the barn and came back for another load, when he discovered the house was afire,

and he and his helper then went over to the fire.

Mr. Morgan, who lived about 300 yards from the Coffman house, testified that he had, for Mr. Coffman, mowed the Johnson grass on some 15 or 20 acres around the house about 30 days before the fire, and that Mr. Coffman told him he was going to have his son Bob burn it off. The theory of appellee is that the fire originated almost opposite the Coffman house on appellant's right of way at a point located about 50 to 100 yards from the house. The witnesses Bob Coffman, Hugh Anderson, and Bob Petrie all testified that, after the house had burned down, they went to the railway right of way to ascertain, if they could, where the fire started; that at that time there was a little fire burning against the wind on the right of way, and the main fire had gone away to the north, across the farm, and was still burning on the north end of the field. There was no contention on the part of any of the witnesses that the fire could have been started by the railway, unless it started almost opposite the house. If the fire did originate there, it could not have taken it but a few minutes, in the dry mowed grass, to have burned to the house, and it would not have been possible for it to have taken as long a time as fixed by the witnesses for it to have reached the house and set same afire. It does not sound reasonable that the fire would have gone out at every place except the small patch that was burning against the wind at the place where it was nearest the railroad track and far over on the north side, if the fire had originated at the place it was still found to be burning on the right of way. There were two or three other witnesses who testified that they had at different times in the year 1921 seen fires start shortly after one of appellant's trains had passed. After the Coffman house was rebuilt, Mrs. R. E. Alexander and family moved onto the Coffman place. Each of the witnesses asked with reference thereto testified that he had never at any time seen any sparks coming from one of appellant's engines, and had never seen any fire emitted therefrom. It was an undisputed fact that the engines used by appellant on its railway at the time of the fire were equipped for and were burning oil for fuel, and the jury found that same were equipped with the most modern appliances to prevent the escape of fire, and that appellant had used ordinary care to keep same in repair. A number of expert witnesses testified; and they as well as the railroad employees testified that an oil-burning engine would not and could not emit sufficient sparks to cause a fire. The evidence shows that just a small portion of the grass on the right of way of appellant was burned; that there were tall green blood-weeds and green Johnson grass on the right of way as well as some dead grass in the bloodweeds. The larger portion of the

burned territory was north of the house. When the first parties reached the burning house, they found old man Coffman there with a sack, with which he had been fighting the fire. No statement was obtained from him. He at that time was past 80 years of age, and at the time of the trial was dead.

Under facts much stronger than those surrounding this case, our courts have held that the evidence was not sufficient to support a finding by the jury that a fire was caused by sparks from an engine, and there are numerous cases reported that have been reversed by appellate courts because of the insufficiency of the testimony. Talley v. G., C. & S. F. Ry. Co. (Tex. Civ. App.) 176 S. W. 65; G., C. & S. F. Ry. Co. v. Meentzen Bros., 52 Tex. Civ. App. 416, 113 S. W. 1000; I. & G. N. Ry. Co. v. Morgan, 28 Tex. Civ. App. 348, 67 S. W. 425; St. L. S. W. Ry. Co. v. McIntosh & Carlisle, 59 Tex. Civ. App. 570, 126 S. W. 692; St. L. S. W. Ry. Co. v. Adcock (Tex. Civ. App.) 269 S. W. 144. Where the finding of the jury is against the overwhelming weight of the testimony to such an extent that its finding is manifestly wrong, it is the duty of the appellate court to set the finding aside. Good v. Good (Tex. Civ. App.) 293 S. W. 621; Schimmel v. Meyer (Tex. Civ. App.) 272 S. W. 639; Kirby Lumber Co. v. R. L. Lumber Co. (Tex. Civ. App.) 279 S. W. 546; Roman v. St. L. S. W. Ry. Co. (Tex. Civ. App.) 160 S. W. 431. In our opinion, the finding of the jury that sparks or fire from appellant's engine caused the fire is so against the overwhelming weight of the testimony that same should not be permitted to stand.

There being no complaint of the judgment of the trial court instructing a verdict against all of the heirs of Mrs. Coffman, who joined in the suit to recover their undivided one-half interest of the value of the property destroyed, the judgment as to them is affirmed. The judgment of the trial court awarding Deck Coffman, administrator, recovery is reversed and remanded.

### On Motion for Rehearing.

PER CURIAM. Rehearing denied.

GALLAGHER, C. J. (dissenting). The original opinion in this case as written by my esteemed associate, Mr. Justice BARCUS, reversed the judgment and remanded the cause to the trial court on several grounds. While I concurred in that opinion at the time it was handed down, I had some misgivings with reference to that part of the same which based our reversal in part on the declaration that the evidence was insufficient to support the judgment with reference to the issue of whether the fire which caused the damage sued for originated on the right of way of appellant, and whether it was caused by one of its engines. Since appellee's motion for rehearing was submitted, I have made a painstaking examination of the statement of facts, and have also read and carefully considered every decision I could find where the origin of the fire complained of was attributed to an oil-burning engine. After such examination and consideration I have reached the conclusion that I erred in assenting to the original opinion on this point.

It will probably be helpful to first review the authorities with reference to the power and duty of an appellate court in determining whether a judgment entered in pursuance of findings by a court or jury shall be reversed for insufficiency of the evidence supporting the same. The rule was announced at an early day in this state, and has been since consistently followed, that an appellate court will not set aside a verdict and grant a new trial merely because it, upon examination of the evidence, might have reached a different conclusion. We quote from Carter v. Carter, 5 Tex. 93, 102, on this subject as follows:

"But to judge of the degrees of probability and the weight of evidence, belonged to the jury. These were subjects within their peculiar and exclusive province. And when they have confined themselves within their appropriate sphere, and have acted upon a subject within their peculiar province, the court will not set aside their verdict and grant a new trial, merely because they might, upon an examination of the evidence, have arrived at a result different from that obtained by the jury, or because the verdict is against the mere preponderance of testimony or the weight of evidence; nor merely because it may appear to them to be founded upon slight evidence."

This rule is supported by a vast array of authorities, from which the following only are selected: Swinney, Green & Co. v. Booth, 28 Tex. 113, 116; Light & Power Co. v. Lefevre, 93 Tex. 604, 608, 57 S. W. 640, 49 L. R. A. 771, 77 Am. St. Rep. 898; Jacobs, Bernhein & Co. v. Hawkins, 63 Tex. 1, 4; H. & T. C. Ry. Co. v. Larkin, 64 Tex. 454, 460; H. & T. C. Ry. Co. v. Lowe (Tex. Sup.) 11 S. W. 1065, 1066; G., C. & S. F. Ry. Co. v. Necco (Tex. Sup.) 18 S. W. 564, 565; El Paso Land Improvement Co. v. Crawford (Tex. Civ. App.) 280 S. W. 914, 916, par. 5 (reversed for failure to submit additional issues [Com. App.] 292 S. W. 518); Southwestern Portland Cement Co. v. Bustillos (Tex. Civ. App.) 216 S. W. 268, 271, 272, par. 13 (writ dismissed); G., C. & S. F. Ry. Co. v. Wallace, 2 Tex. Civ. App. 270, 21 S. W. 973, 974; White v. Bell (Tex. Civ. App.) 242 S. W. 1082, 1087; Cochran v. Moerer, 47 Tex. Civ. App. 372, 105 S. W. 1138 (writ refused).

The general rule announced by our Supreme Court is that, in order to justify an appellate court in setting a judgment aside for insufficient evidence, it must appear that such judgment is contrary to the evidence, or

is without any substantial support in the evidence, or that it is against such an overwhelming preponderance of the evidence as to indicate that the jury were influenced by improper motives, or that manifest injustice has been done, or that such judgment is clearly wrong. H. & T. C. Ry. Co. v. Schmidt, 61 Tex. 282, 285, 286; H. & T. C. Ry Co. v. Lee, 69 Tex. 556, 560, 7 S. W. 324; G. C. & S. F. Ry. Co. v. Mangham, 29 Tex. Civ. App. 486, 69 S. W. 80, 81 (writ refused), and authorities there cited; St. L. S. W. Ry. Co. of Texas v. Smith, 30 Tex. Civ. App. 336, 70 S. W. 789 (writ refused); Baker v. Grace (Tex. Civ. App.) 213 S. W. 299, 305, 306 (writ refused); Kanaman v. Hubbard (Tex. Civ. App.) 160 S. W. 304, 308, par. 6; Nations v. Miller (Tex. Civ. App.) 212 S. W. 742 (writ dismissed); Selz, Schwab & Co. v. Shipman (Tex. Civ. App.) 230 S. W. 842, 843, and authorities there cited.

Subject to the foregoing qualifications, a verdict on conflicting evidence will not be disturbed on appeal. The authorities in support of this proposition are so overwhelming that it is not deemed necessary to state any one or more of them in particular. Reference is here made to 2 Tex. & S. W. Dig. pp. 1639–1649, ☞1002, and 1 Tex. & S. W. Dig. pp. 356–360, ☞1002, where hundreds of cases so holding are collated.

In harmony with the propositions above announced and the authorities cited in support of same, the general rule for determining whether the court erred in submitting an issue, in directing a verdict, or in refusing to set a verdict aside for lack of sufficient support in the evidence, is the same, and such rule is that, in determining either of such contentions, an appellate court must consider the evidence in its most favorable aspect for the opposite party, disregarding conflicts and contradictions, since they merely raise an issue of credibility, which issue is for the jury. Eastham v. Hunter, 98 Tex. 560, 565, 86 S. W. 323. The same rule is stated more fully in Harpold v. Moss, 101 Tex. 540, 542, 109 S. W. 928, from which the following quotation is made:

"Harpold testified to the facts substantially as alleged in his petition. Upon the material facts he was flatly contradicted by the testimony of Moss, and in some particulars by the testimony of other witnesses. It may be conceded, also, that Harpold's version of the transactions was not very probable. The error assigned is that the court erred in instructing a verdict. The rule that is applicable to this question is very clearly announced in the case of Eastham v. Hunter, 98 Tex. 560, 86 S. W. 323, in the following language: 'The plaintiffs in error, having introduced sufficient evidence to support a verdict in their favor, were entitled to have the issue submitted, no matter how strong the contradictory evidence might be. In determining this question we must consider the evidence in its most favorable aspect for the plaintiffs in error, disregarding conflicts and contradictions. They raised the issue of credibility, which was a question for the jury.' To judge of the credibility of the witnesses and the weight to be given to their testimony is peculiarly the province of the jury. *Hence, whenever the court undertakes to say that the testimony of a witness is entitled to no credit, because it is overborne by contradictory testimony, or that it is so contrary to circumstances in proof which render it improbable, it very clearly assumes the function of the jury, and its ruling should not be permitted to stand.*" (Italicized by writer.)

Among the many authorities supporting the rule above announced, the following alone are cited: Choate v. S. A. & A. P. Ry. Co., 90 Tex. 82, 85, 86, 36 S. W. 247, 37 S. W. 319; Progressive Lumber Co. v. M. & E. T. Ry. Co., 106 Tex. 12, 14, 155 S. W. 175; Cartwright v. Canode, 106 Tex. 502, 507, 171 S. W. 696; Burroughs v. Smith (Tex. Civ. App.) 294 S. W. 948, 950–952 (writ refused); Stewart v. Miller (Tex. Civ. App.) 271 S. W. 311, 315 (writ refused); Commerce Farm Credit Co. v. Torrance (Tex. Civ. App.) 7 S.W.(2d) 1110, 1111; Drane v. Humble Oil & Refining Co. (Tex. Civ. App.) 4 S.W.(2d) 241, 243 (writ refused); Austin v. Nieman (Tex. Civ. App.) 3 S.W.(2d) 128, 129, par. 1.

The jury in this case found that appellant, at the time of the fire which destroyed the Coffman house, had allowed combustible material to accumulate on its right of way; that appellant was negligent in permitting such material to accumulate thereon; and that such negligence was the direct and proximate cause of the fire which destroyed said house. None of these findings are assailed. They eliminate any question of negligence on the part of appellant with reference to the construction, maintenance, or operation of its engines, and make the issue of appellant's liability depend alone on whether said fire originated on the right of way from sparks or fire from one of its engines.

The cause of a fire originating upon the right of way of a railroad is seldom susceptible of affirmative proof from the actual observation of a witness. That is, the eye cannot ordinarily follow the livid spark, or, in case of oil-burning engines, the ignited or superheated soot or carbon or the molten sand from the smokestack to the inflammable material on the ground, and note the actual ignition of such material therefrom. So the origin of a fire on a right of way must ordinarily be proved, if proved at all, by circumstantial evidence. The ultimate finding that the fire originated from matter expelled from the smokestack of an engine is an inference which the jury is authorized to draw, or to refuse to draw, from the facts in evidence. The following issues were submitted

to the jury in this case and answered as shown, to wit:

"(1) Was the fire which burned the plaintiff's house set out by the escape of sparks or fire from defendant's engine?" Answer: "Yes."

"(2) Did the fire in question which destroyed plaintiff's house break out in the grass and weeds, if any, on defendant's right of way?" Answer: "Yes."

In this case appellee relies on evidence of the following facts to support such findings: (a) That a train passed just before said fire was first discovered; (b) that said fire was first seen burning on the right of way; (c) that it spread therefrom to the Coffman field, and afterward to the house; (d) that no other probable cause for such fire than the passing engine was shown; (e) that frequent fires had originated on the right of way after the passing of trains at or about that time; (f) that oil-burning engines can and do sometimes emit sparks, burning or superheated soot or carbon, and molten sand from their smokestacks.

Since I cannot agree to all the findings of fact in the majority opinion, it will be necessary to state some of the evidence upon which the findings of the jury were predicated, and, for the purpose of greater accuracy, to quote some of the evidence literally. Letha Alexander testified:

"*I am sure I saw a freight train going north somewhere between two and three o'clock that afternoon* * * * When I first saw the fire it was on the right of way of the railroad* * * * I don't know just how long it was after the train went north before I saw that fire on the right of way, but it wasn't a long time, it was a short time* * * * The reason I know the fire was on the right of way was I could just see the fence and see that the fire was inside of the fence on the right of way* * * * I saw the fire between me and the telephone posts* * * * It was about thirty minutes after I first saw the fire on the right of way until I saw the house on fire* * * * The fire spread and it went toward the house. I saw it burning across there, all the way across.*"

Mrs. E. R. Alexander testified:

"I recollect when the Coffman house burned* * * * After lunch (that day) I went to Crawford* * * * After I got back from town and between the time I got back from town and the time I received word that the house was on fire, I saw a train pass our place* * * * That was a freight train that I saw, going north."

Mr. A. D. Black testified:

"I was at home that morning of the fire breaking stubble, but after dinner, somewhere about two o'clock, I went to my brother's, who lived on the M. M. Coffman farm* * * * When I started out to go to my brother's place I saw a train on the Santa Fé railroad. That train was going north and it was a freight train. After that train went by me I continued on my way to Mr. Coffman's place. I judge my brother lived about a mile from the Coffman house."

Mr. Perry Sterling testified:

"I did and now have knowledge of the fire that took place in 1921 on the Coffman place which destroyed the homeplace of Mr. Coffman. I was hauling hay off the Graves place on that day, which is right adjoining the Coffman place* * * I saw the fire. *The first I noticed of it, it was across the track on top of a dump between me and the telegraph poles, and I saw the fire and smoke. I could see it very plainly.* It was around two o'clock I suppose when I first noticed it, but I don't know for sure; I didn't have the time* * * * I guess that after I saw the fire on the dump, I carried the load that I was then loading to the house and then came back and made another load before I saw the house burning. As well as I remember *it was something like four o'clock when I discovered the house afire*, just guessing at it, I didn't have the time with me so didn't know of course."

The above testimony with reference to the passing of a freight train northward over appellant's road immediately preceding the discovery of the fire is affirmative and substantial, and ample, standing alone, to support a verdict. Appellant, in rebuttal thereof, introduced the records of passing trains kept by its agents at McGregor, Crawford, and Valley Mills; the two former stations being located south, and the latter north, of the scene of the fire. Said records covered various days from July 1 to August 4, 1921, inclusive. Appellant's agents who kept such records testified that they were correct. They showed no freight train north on that day at the time appellee's witnesses testified to having seen one pass going in that direction. Appellee introduced testimony tending to show various inconsistencies, and contradictions in such records. Appellant's train dispatcher and section foremen also denied that any such train passed north that day. The jury, by necessary implication, found that such a train did pass just before the discovery of the fire. According to the rules above announced and the authorities cited in support of the same, the issue of whether a train passed north at that time or not involved the credibility of witnesses and the weight to be given to their testimony, and the finding of the jury thereon is binding on this court. The courts have also specifically so held on this identical issue. Hines v. Jumper (Tex. Civ. App.) 229 S. W. 350, 351 (writ dismissed); Missouri Pacific R. Co. v. Wood, 165 Ark. 240, 263 S. W. 964, 965; Missouri Pacific R. Co. v. Stone Grocery Co., 163 Ark. 247, 259 S. W. 728.

The jury found specifically that the fire originated in the grass and weeds on the

right of way. Both Letha Alexander and Mr. Sterling testified that it was first seen there. She testified she saw it spread over the intervening field of mowed grass until it reached the house, according to her estimate, about 30 minutes thereafter. Mr. Sterling testified that he saw the fire on the bank at the edge of the cut on the right of way, and that, according to his estimate, it reached the house an hour and a half or two hours thereafter. The right of way, according to the testimony, had both dry and green vegetation thereon at the time. The telephone posts referred to by both the above witnesses were on the right of way next to the fence, between such right of way and the Coffman field, and on the opposite side of the track from said witnesses. The Johnson grass in that field had been cut about 2 weeks at the time of the fire. It was dry, and doubtless constituted an effective and rapid fire carrier from the right of way to the house. Parties attracted to the burning house went down to the right of way. Mr. Anderson, one of these parties, testified that, when he reached the right of way, the fire was still burning further up in the field, and also on the right of way down by an old well. He further testified that at that place on the right of way the grass and weeds were bedded down and looked like a drift; that the burnt place on the right of way covered about half the distance from the fence to the track, and was approximately 200 yards long up and down the right of way. Other testimony confined the length of the burnt place up and down the right of way to narrower limits. Appellant's foreman testified that the track at that point was in the cut about 8 feet deep. He further testified that it was only about 16 feet from the top of the cut to the right of way fence next to the field. He also testified, in substance, that it was about 30 feet from the fence to the edge of the burnt place on the right of way next to the track. None of the witnesses other than Letha Alexander and Mr. Sterling testified to the time or place of the origin of the fire.

Appellant, in rebuttal of the testimony, advances the theory that Mr. Coffman or his son Robert set fire to the Johnson grass on said field, and that such fire burned from the field into the right of way and went out thereon of its own accord. In support of this theory appellant emphasizes the fact that fire was still burning on the right of way when the house was burning. Appellant's witness Mr. Morgan testified that he himself cut the Johnson grass in the Coffman field about 2 weeks before the fire; that Mr. Coffman at that time offered to give it to him, and stated he did not want it himself; that he did not want to bale it and use it for fear of scattering the seed; that he would rather let it get dry and burn it; that some day when his son Bob was there he would get him to help burn

it. Said witness further testified that he saw Bob Coffman that day about 9 o'clock in the morning at the crossing on the Bosque 3 miles from the Coffman place, traveling in that direction. He further testified that, when he returned home that afternoon, he saw smoke in the direction of the Coffman place; that just about that time some one telephoned him that the Coffman house was on fire, and asked him to call Bob Coffman; that he went up to the burning house, and saw Mr. Coffman standing in one of the rooms with a wet sack on his arm; that he appeared dazed, and looked like he had been fighting fire; that Bob Coffman came up while the house was burning. Both Mr. Coffman and his son Bob were dead at the time of the present trial. Bob Coffman's testimony given at a former trial was introduced, in which he stated that he was in Crawford when he first heard of the fire; that he had not been to his father's place that day; that he went there immediately, and found the house burning.

According to the affirmative testimony of two witnesses, the fire was first seen burning on the right of way. The attempt to rebut this testimony involves also the question of whether any probable cause for said fire other than the passing engine was shown. Reduced to basic facts, the testimony merely shows that Mr. Coffman, about 2 weeks prior to the fire, had declared that he intended, with the assistance of his son Bob, to burn the mowed grass; that, when the fire was actually burning the house, Mr. Coffman, then about 80 years old, was found standing therein alone; that his son Bob was in Crawford, and had not been to the farm that day prior to the fire; that he arrived there some time after the neighbors had gathered at the scene. It is not reasonably probable that Mr. Coffman at his age, without the contemplated assistance of his son, would have attempted to set the field afire without taking some steps to safeguard his home. The presence of fire on the right of way while the house was burning is sufficiently explained by the testimony that there was a mixture of dry and green vegetation on the right of way, and that such vegetation was "bedded or drifted," thereby furnishing means for holding a smoldering fire indefinitely. For that matter, the dry mowed grass in the field was also still burning at that time. As circumstances tending to explain or account for the origin of the fire, the matters above recited are deemed wholly insufficient to rebut the affirmative testimony of said witnesses that such fire originated on the right of way, and was not communicated thereto from the adjoining field. Whether such circumstances have sufficient probative force in the light of the undisputed testimony to raise an issue on the question of the fire's having been voluntarily set out by Mr. Coffman is seriously

doubted. Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059.

Appellant also advances the theory that the testimony of Letha Alexander raises an issue as to whether the presence of section men on the track as testified by her also affords a possible explanation of the cause of the fire. Reference to said testimony is made in the majority opinion. Letha was working from one-fourth to one-half a mile north of the scene of the fire. We quote her testimony on this point in full:

"I did see some section men down there that day. They were just a little piece from where we were working at. I don't hardly know whether they were north or south of where we were, between us and Valley Mills or between us and Crawford, but they were working right at where we were. They worked down even with us. I didn't count the men and I don't know how many were in the gang. I suppose there was more than one man in that section gang. They were working in the road just about opposite where I was working. I noticed these men before dinner but I didn't notice them after dinner."

The evidence showed that the division line between the Crawford section and the Valley Mills section was located somewhere in the neighborhood of where Letha was working. Certainly this testimony with reference to seeing section men working down the track from the north some time during the morning was insufficient to account for a fire a half a mile below the place at which they were working which occurred between 2 and 3 o'clock in the afternoon.

There was affirmative testimony that a large number of fires were discovered on appellant's right of way at or about the time of the fire that destroyed the Coffman house. Letha Alexander testified to having seen two other such fires during that year. Mrs. E. R. Alexander testified that there were a number of such fires, and testified about two of them in particular. She testified that on both said occasions she telephoned the section hands, and they came and put out the fire. She testified that on one of said occasions she was watching the train as it passed; that there was no fire on the right of way before it passed; that fire was burning on the right of way when the caboose passed her. Mr. Ponder testified to having seen a fire spring up on the right of way immediately after the passing of a train, and he was corroborated as to the existence and effect of the fire by Mr. McCorkle. Mr. Farrish testified that about that time he saw two or three fires spring up on the right of way immediately after the passing of a train. Each of the seven or eight specific fires testified to by said witnesses appears to have been separate and distinct from the others. There was no attempt to contradict the above testimony nor to account for the origin of such fires by

showing any probable cause other than the passing engine.

Appellant had used oil-burning engines on its road exclusively for a period of 10 years at the time of the fire. The form of inspection report then in use contained the following query: "Does the engine throw or drop fire?" and this query was regularly answered in such reports. All the expert testimony in the record with reference to the danger of the communication of fire to the right of way from an oil-burning engine was elicited from appellant's witnesses. The witness W. N. Clark testified that an engine would not drop fire except when standing still, and that, when it did, the fire was dropped right between the rails. He further testified: "Oil burners, they hardly ever throw any fire." He also testified that he did not know whether they did or not. There was testimony that soot or unburned carbon accumulated in the flues of the engine; that, in order to remove the same, sand was forced through the tubes every 10 or 15 miles; that the flues had to be cleaned oftener when going up grade, and that it was up grade from Crawford to the scene of the fire. There was testimony that the rules of the road required that open flat cars loaded with cotton be placed three or four cars back of the engine in making up a train. The witness Rothrock testified:

"Of course you can see a spark, a reddish spray, occasionally, but is a very occasional occurrence, and that is generally sand. We use sand, blowing it through the flues to clean the tubes out, and of course that might go out in a lit state, but it goes so high that it is out before it ever falls. It only lasts the twinkling of an eye. I would not say that there is a whole mass of that stuff that goes out constantly. It usually goes out—that is the fire is out—before it hits the ground. Of course I can't say that it does definitely because I have never seen a mass going out like you describe. I have seen black smoke going out of the smokestack. I have also seen small flakes of hot sand and have seen a sort of carbon inside of those fireboxes go out sometimes, but it is very rare."

The witness Rogers testified:

"It is possible for little sparks to go out through the smokestack sometimes, just little grains of sand, or something like that, when you turn on the sand, and sand out the flues, those little particles of sand get mighty hot. As a matter of fact I expect some of them come out of the smokestack practically melted. I expect it is mighty hot in there. If there is any soot or carbon in the flues or the firebox or the smokestack, that sand brings those particles of soot or carbon on out with it. That is the purpose of sanding the flues."

The witness A. Y. Clark testified:

"I have seen small sparks come out of an oil-burning locomotive when the locomotive

*was being sanded out.* That is the only time I have ever noticed them."

The witness Degarmo testified:

"I say that the soot when it comes out of the smokestack, what there is of it that does come out, is hot, and the sand particles, such as do come through and go on out would also be hot ordinarily. However, neither the soot nor the sand comes out of the stack red hot. You don't see them come out of there red, they are red while they are in the firebox but when they get out through those flues you *very seldom see a red spark of sand come out of the stack.*"

The testimony of each of the foregoing witnesses shows as a fact that, at least on rare occasions, what they called sparks, that is, ignited or superheated soot and carbon and molten sand, are expelled from the smokestacks of oil-burning engines. It is true that each of said witnesses declared it to be his opinion that the same would cool and become innocuous in passing through the air, and would not start a fire where they fell. In this case the engine was running in a deep cut, and the top of the bank thereof was somewhere near on a level with the top of the smokestack, which reduced the distance which the burning or molten particles would have to travel to reach the ground, and would therefore reduce the cooling time and facilitate the ignition of inflammable material where they fell. The effect of the contact of ignited or superheated particles of soot or carbon or molten sand with inflammable material is a matter of common knowledge, and cannot be said to belong exclusively to the domain of expert evidence. The jury, in weighing the testimony of these witnesses, had a right to accept the facts stated and reject the opinions expressed by them. Miller v. Flynn (Tex. Civ. App.) 279 S. W. 879, 881. The jury evidently did so. The jury, however, in addition to the affirmative testimony so recited, had a right to consider in connection therewith, in determining the issue of whether it was possible for an oil-burning engine to start a fire on the right of way, the force and effect of the testimony before them with reference to numerous fires discovered at or about that time on the right of way, for the starting of which no other cause than the passing engine was shown. Such inference is permissible in connecting the links of a chain of circumstantial evidence. Progressive Lumber Co. v. M. & E. T. Ry. Co., 106 Tex. 12, 16, 17, 155 S. W. 175. The finding of the jury includes, by necessary implication, a finding that an oil-burning engine can set out a fire on the right of way by matter expelled from its smokestack, and such finding is clearly supported by the evidence above recited. All the several facts hereinbefore enumerated from (a) to (f), inclusive, upon which appellee relies to support the inference drawn by the jury and found as a fact by their verdict that said fire was set out by one of appellant's engines, have been, it is submitted, proved with affirmative evidence, express and circumstantial, of such force and cogency that an appellate court is not authorized under the rules hereinabove recited and authorities cited in support thereof, to set the same, or any of the same, aside.

The remaining question to be discussed is the sufficiency of the evidence to support the finding of the jury that the fire which burned the Coffman house was set out by the escape of sparks or fire from one of appellant's engines. The evidence on this issue, as before shown, is necessarily circumstantial. The finding itself is therefore an inference or conclusion drawn by the jury from the facts in evidence as they found them. The facts relied on to support such finding have been set out in detail. It has been shown that each of these facts is supported by substantial testimony, and is either uncontradicted or is further supported by a finding of the jury either express or necessarily implied. It was the peculiar province of the jury to determine the ultimate fact, that is, whether the fire was set out by one of appellant's engines, from said circumstances. Our Supreme Court, speaking through Chief Justice Stayton. in the case of Stooksbury v. Swan, 85 Tex. 563, 571, 573, 22 S. W. 963, 966, said:

"The inference of one fact from the existence of others is for the jury, and not for the court, in all cases in which the fact to be inferred or presumed is to be believed or rejected, as the application of reason and common experience to the facts proved may justify. This involves a weighing of evidence. * * * In all cases the existence or non existence of the facts the evidence tends to prove, if there be conflict, as well as the existence or non existence of the fact to be inferred from other facts, must be left to the determination of the jury."

Chief Justice Key, speaking for the Third Court of Civil Appeals in Early-Foster Co. v. Klump, 229 S. W. 1015, 1023, said:

"So, in the present case, as in the case cited [Texas Life Ins. Co. v. Legg (Tex. Civ. App.) 229 S. W. 587, 588], there was no direct or express proof of an agreement that the amounts paid by the defendant should be accepted by the plaintiff as a satisfaction of its entire demand, and such agreement, if found to exist at all, would have to be inferred from the existence of the facts in evidence; and, as, in effect, held in the case just cited, the general rule is that when a particular fact is to be inferred from the proof of certain other facts, either party has a right to have a jury decide whether or not such inference should be made."

This court in Jester v. Lancaster, 266 S. W. 1103, 1106 (writ refused), discussing an agreed statement of facts, said:

"There is nothing in such agreed statement of facts tending in any way to show

where such erroneous delivery took place nor any of the circumstances attending the same. If the facts so agreed upon raise the issue of actual conversion of appellant's trunk, they do not show such conversion with such certainty that reasonable minds cannot differ as to the effect thereof. This being so, the issue was one for the court or jury trying the case."

See, also, in this connection, Supreme Council v. Anderson, 61 Tex. 296, 301;' Lee v. I. & G. N. Ry. Co., 89 Tex. 583, 588, 36 S. W. 63; Miller v. Flynn (Tex. Civ. App.) supra, 279 S. W. page 881, par. 3; Hutchens v. St. L. S. W. Ry. Co., 40 Tex. Civ. App. 245, 89 S. W. 24, 25, 26; Humble Oil & Refining Co. v. Martarana (Tex. Civ. App.) 272 S. W. 299, 301, par. 1; Chapman v. First Nat. Bank (Tex. Civ. App.) 275 S. W. 498, 501, pars. 3 to 5; El Paso Sash & Door Co. v. Crawford (Tex. Civ. App.) 292 S. W. 924, 925; Chicago, R. I. & G. Ry. Co. v. Abdou (Tex. Civ. App.) 1 S.W.(2d) 493, 495, par. 3; Dunlap v. Oak Cliff Pharmacy Co. (Tex. Civ. App.) 288 S. W. 236, 238 (writ refused); Buchanan v. Davis (Tex. Civ. App.) 300 S. W. 985, 989, pars. 8–12; Southern Surety Co. v. Solomon (Tex. Civ. App.) 4 S.W.(2d) 599, 602, 603, par. 11.

Recovery of damages resulting from fires charged to have been set out by oil-burning engines has been sustained or authorized both in this state and elsewhere. G., C. & S. F. Ry. Co. v. Curry (Tex. Civ. App.) 135 S. W. 592; Schattenberg v. H. E. & W. T. Ry. Co. (Tex. Civ. App.) 168 S. W. 8; Ponder v. Burris (Tex. Civ. App.) 244 S. W. 1116; I. G. N. Ry. Co. v. Straub (Tex. Civ. App.) 7 S.W.(2d) 112; Viera v. A., T. & S. F. Ry. Co., 10 Cal. App. 267, 101 P. 690; Slaton v. C., M. & St. P. Ry. Co., 97 Wash. 441, 166 P. 644; Roundtree v. Mt. Hood R. Co., 86 Or. 147, 168 P. 61, 62; Reuter v. S. P., L. A. & S. L. Ry. Co., 37 Cal. 277, 174 P. 927. We have found no case holding as a matter of law that an oil-burning engine cannot set a fire. The Supreme Court of Oregon, in Roundtree v. Railway, supra, quoted with approval from Slaton v. Railway, supra, as follows:

"We cannot hold, as a matter of law, as we are invited to do by appellant, that an oil-burning engine cannot cause a fire upon a right of way."

Every opinion on the subject must necessarily be read in the light of the evidence before the court upon which it was based. In G., C. & S. F. Ry. Co. v. Curry, supra, there was testimony before the court that the fire sprang up on the track, the right of way, or near the right of way, just after a train had passed. There was also testimony that the fire originated some distance from the right of way, and was in progress before the train passed that point. Appellant introduced testimony that all its engines burned oil; that they were in good condition; and that it was impossible for fire to escape from such engines. The above is a synopsis of the entire testimony. The court said:

"This testimony raised a conflict which it was the peculiar province of the jury to determine, and, there being sufficient evidence to sustain the verdict, this court is not authorized to disturb it. If the plaintiff's witnesses are to be believed, and the jury have said that they are, no other reasonable conclusion can be reached than that the fire was set out by an engine on appellant's road. If this is true, then the testimony of appellant's witnesses that the engines which were operated on the road were oil burners and that it is impossible for fire to be set out by such engines cannot be true, and the engine that set out this fire was either not an oil burner, or fire can escape from an oil-burning engine. It cannot therefore be said that the testimony of appellant's witnesses as to the character of the engine and the impossibility of fire escaping therefrom is uncontradicted. While not contradicted by direct evidence, it is contradicted by the circumstances testified to by appellee's witnesses, and these circumstances, if believed by the jury, authorized a verdict in favor of appellee. Railway Co. v. Baugh [Tex. Civ. App.] 43 S. W. 558; Railway Co. v. Ellis (recently decided by this court) 134 S. W. 246."

The testimony in Schattenberg v. Railway, supra, showed that one or two trains had passed the premises in question; that there was no fire visible prior to their passage; that fire was discovered on the right of way thereafter. One witness testified that he had seen engines on that railroad set out fire along the right of way. The engines burned oil. This is the substance of all the testimony. The court held the testimony sufficient to indicate that the fire was set out by one of said engines.

In Ponder v. Burris, supra, the engine was an oil burner. The court said that the evidence was sufficient to show that the fire was started on the track by an engine which passed over the same a short time before. The court further stated that the evidence showed that sparks were not emitted from engines burning oil, but that the flames of the oil could set grass afire on the track between the rails. The judgment awarding a recovery was affirmed.

The case of I. G. N. Railway v. Straub, supra, was decided by this court and the opinion written by Mr. Justice Barcus. A fuller statement of the evidence than that contained in the opinion can therefore be made. The appellant's testimony in that case showed that the engine was an oil burner; that oil burners did not need spark arresters; that it was impossible for sparks to fly out of the smokestack and light on the right of way; that an engineer could not make sparks fly out of the smokestack; that there was no way he could do that; that it was impossible for fire to get out of the firebox

and get on the right of way because it was an atomized blaze. Appellee's testimony showed that the fire was first seen on the right of way just after a train had passed. While the evidence does not show specifically that the fire originated between or at the rails, where it would necessarily start if set from the firebox, it does not exclude such a possibility. The appellee himself testified that he had observed oil-burning engines on the Houston & Texas Central Railroad; that he had seen grass and greasy ties ignited immediately after the passage of trains, but had never seen this on appellant's road; that he had seen sparks flying out of the engines, but had never seen sparks coming out of the smokestack. A recovery by appellee was sustained by this court.

The case of Viera v. Railway, supra, was decided by a Court of Appeals of the state of California, but the Supreme Court of that state refused a rehearing. The engine was an oil burner. Sparks had been theretofore seen escaping from the smokestacks of defendant's engines, but there was no such testimony with reference to the engine in question. Fire was discovered on the right of way immediately or very shortly after the passing of a train. No other cause for the fire was shown. The following is quoted from the opinion in that case:

"The law does not require demonstration or absolute certainty because such proof is rarely possible. Moral certainty only is required. We must call in aid of the verdict all deductions which the jury could make from the facts proved. Nearly all cases are determined on the reasonable probability of the fact being as found. Human laws and institutions are not perfect, and with the most careful vigilance of the judge, and the most conscientious discharge of their duty by twelve men duly sworn, the final result in most cases is but an approximation. In the present case it has not been demonstrated beyond doubt that the fire was caused by sparks escaping from defendant's engine, but a fire did occur, and originated on or near defendant's right of way, on which was a large quantity of dry grass. It was seen almost immediately after defendant's engine had passed. Plaintiff's property was destroyed. The reasonable probability that the fire was caused by sparks from defendant's passing engine has been determined by the agreement of 12 men. This is one of the methods the law has provided for the settlement of questions of fact, and we cannot set aside the verdict of the jury when supported by such evidence as herein indicated. It is true that the evidence of the defendant showed that the engine was an oil burner in first-class condition. Two engineers of defendant testified that they had never known of sparks escaping from an oil-burning engine and setting fire to grass on the road. But, as we have said, the evidence is sufficient to justify the jury in finding that the fire was caused by defendant's passing engine."

The above excerpt from the case was quoted with approval by the Supreme Court of Washington in Slaton v. Railway, supra, and made the basis of the court's decision in that case. In the last-named case it was strenuously insisted that oil-burning engines could not throw sparks or other heat-carrying particles. There was evidence that a train passed just before the fire was discovered, but there was no specific evidence concerning the engine pulling the same. There was testimony that other fires occurred along the right of way about that time. The engine was an oil burner. The following is quoted from the opinion in that case:

"A box of sand is carried on each engine, and as required the fireman throws a shovelful into the firebox. This is taken up by the blast and forced through the boiler tubes, clearing them of all soot and hardened particles. One witness called such particles carbon. The possibility of throwing such particles, if not coarse grains of sand or small gravel, which would, of course, blow out of the [smoke]stack heated to an intense heat, was shown."

The recovery in that case was sustained.

The case of Roundtree v. Railway, supra, was decided by the Supreme Court of Oregon. The following is quoted from the opinion in that case:

"(3) In brief, there was evidence tending to show that there was no fire before the engine reached the place where the fire occurred; that while the train was passing smoke was seen to arise above the train and that a fire was seen to be burning before the train had passed; and there was also evidence from which the jury could find that the fire could not reasonably be accounted for except on the theory that it originated from the engine. This afforded sufficient evidence to support the inference that the fire was caused by sparks or fire emitted from the engine." (Citing numerous authorities.)

"(4) The plaintiffs were not obliged to show by direct evidence that the fire originated from the engine, but they had the right to avail themselves of circumstantial evidence tending to show that the damage complained of was caused by fire from the engine. The trial court correctly denied the motion for a directed verdict and submitted the controversy to the jury.

"(5) The defendant contends, however, that the engine used by the defendant was an oil burner; that it had been used for several years and had never been known to cause fire; that sparks are not and cannot be emitted from an oil burner; and that an oil burner when working perfectly, as it is claimed that this engine was, could not emit sparks which would cause fire. The answer

to this contention is that there was evidence contradicting the evidence offered by the defendant and it was therefore the province of the jury to decide the controverted fact."

The engine in the case of Reuter v. Railway, supra, was an oil burner. The fire originated off the right of way. There was evidence in that case that smoke and sparks and flakes of ignited soot or carbon had been seen expelled from the smokestacks of such engines. There was also testimony that fires along the right of way had followed in some such instances. The only specific testimony concerning the engine passing immediately before the fire was that heavy black smoke was coming therefrom. Expert witnesses testified that the fire could not have been caused by the defendant's engines, or by anything which came from them; that it was physically impossible for sand or any other substance coming from the smokestack of an oil-burning locomotive to ignite anything. The following from the opinion in that case is quoted:

"We have also kept in mind the fact that the witnesses who saw the engine and its smoke, on the occasion in question, under a noonday sun, did not testify that they saw any sparks, or flame, or burning soot. Nevertheless, our reading of the testimony leads us to the conclusion that there was satisfactory evidence from which the trial court had the right to become convinced and to find that the fire which destroyed the plaintiff's property was communicated thereto by fire which originated in the grass or brush adjacent to the right of way of the defendant; that these fires had their origin in fire which escaped with the smoke from the engine of the defendant."

The application of the principles of law announced in these cases to the present case is deemed sufficiently apparent not to require elaboration.

A close scrutiny of the facts in the cases cited in the majority opinion will disclose sufficient grounds differentiating them from the present case. The extreme length of this opinion precludes a discussion of said cases.

Believing that this court, under our system of jurisprudence, as declared by an overwhelming weight of authority, is without power to reverse the judgment in this case on the ground that the evidence is insufficient to support the verdict, with due deference to the opinion of my Associates, I am compelled to enter my dissent. The law requires such dissent to be in writing and to state the grounds on which it is based. The action of the Court of Civil Appeals in reversing the case for insufficient evidence is not subject to review by the Supreme Court. The importance, therefore, of the question of such authority and the importance of the issue herein discussed account for the length of this opinion.